State ex rel. Bulkley et al. vs. Whited & Wheless, Ltd.

---

## No. 13,389.

STATE EX REL. P. C. BULKLEY ET AL. VS. WHITED & WHELESS, LIMITED.

### SYLLABUS.

When all the essential elements and conditions for an absolute sale are present
in a contract between parties the effects flowing legally from that contract
follow whether the parties foresaw and intended them or not, and though
they may refer to the contract as an agreement to sell and not a sale.

The fact of placing the thing which formed the object of the sale and the
negotiable notes, evidencing the obligations of the purchaser in the hands
of a third party to be by him delivered when the parties should have
complied with their obligations fully, is not indicative of a suspensive
condition, but of a precautionary measure resorted to by the parties to
safeguard their respective interests under the sale.

A PPEAL from the Second Judicial District, Parish of Bossier—
Watkins, J.

| 104 | 125 |
|-----|-----|
| 105 | 65 |

| 104 | 125 |
|-----|-----|
| 107 | 710 |
| 107 | 711 |
| 107 | 712 |

| 104 | 125 |
|-----|-----|
| 114 | 623 |

Louisiana
| 104 | 125 |
|-----|-----|
| 121 | 155 |
| e121 | 168 |

Louisiana
| 104 | 125 |
|-----|-----|
| 122 | 112 |

*J. A. Snider* for Relators.

*Joannes Smith* and *Leonard & Randolph* for Respondent, Appellant.

The opinion of the court was delivered by

NICHOLLS, C. J. This suit is brought by P. C. Bulkley, in his own right and as agent of his wife, Mary M. Bulkley.

In the petition filed it was alleged that the plaintiffs had an interest in Whited & Wheless, Ltd., a corporation incorporated under the laws of Louisiana and domiciled in Bossier parish.

That the stock of the company or corporation was thirty thousand dollars in shares of par value of one hundred dollars each, and that relator, P. C. Bulkley, subscribed and paid for shares to the value of five hundred dollars; that relator, Mary M. Bulkley, subscribed and paid for shares to the amount of nine thousand five hundred dollars; that at date of incorporation, F. T. Whited and H. H. Wheless, each subscribed ten thousand dollars; that the relator, P. C. Bulkley, was president of said corporation until the first Monday of October, 1899, and had been informed that since that date F. T. Whited had acted as president of said corporation; though to knowledge of relator no publication of such election had been made, or of the convocation of the stockholders as provided by the charter. That to their knowledge H. H. Wheless had been and was still secretary and treasurer of said corporation. That they, or either of them, had never unconditionally sold or disposed of their stock in said corporation, as was evidenced by a written document annexed.

That Mary M. Bulkley was the owner of large tracts of land in said parish of Bossier, the pine timber on part of which she sold, standing, to said corporation upon the terms and conditions writen in exhibits "C" and "D," also annexed; that present officers of said corporation had rendered to relators statements of the timber they had cut, or alleged had been cut, from said lands of Mary M. Bulkley, but refused and still refuse to permit Mary M. Bulkley's attorney in fact, P. C. Bulkley, to examine the books of said corporation so as to verify the correctness of said statements, or correct errors therein, as to the scaling of the timber included and referred to in said exhibits "C" and "D." That so far as they had any knowledge, F. T. Whited and H. H. Wheless were alike

the controllers of said company and the sole custodians of the books, and that relators had made (Mary M. Bulkley through her attorney in fact) verbal and written demands of said custodians of said books of said corporation to inspect them for the purposes heretofore alleged, and that permission to examine said books of said corporation had been absolutely and categorically refused and denied.

In view of the premises, relators prayed that "said F. T. Whited and H. H. Wheless be all and each of them cited according to law, and that a writ of *mandamus* issue commanding them and each of them to give relators, 'P. C. Bulkley in his own right and as attorney in fact for Mary M. Bulkley, to have inspection of the books of Whited & Wheless, Ltd., for the several purposes of examining the stock books of said corporation and for the purpose of correcting if any, of the statements referred to in the foregoing petition, and for such other purposes as are detailed herein, or show cause to the contrary, on a day and hour to be fixed by the court, and that on final hearing, said writ of *mandamus* be made peremptory and for all other necessary orders and decrees, and for general relief."

Defendants excepted.

1st. That the petition showed no cause of action.

2nd. That for whatever rights plaintiffs might possess there were remedies at law, and no ground appeared for the extraordinary writ of *mandamus*.

Under benefit of these exceptions defendant answered.

After pleading the general issue defendants averred that they owned all the stock of the defendant company except one share held by A. E. Eakin, and that neither of the plaintiffs had any proprietary interest in Whited & Wheless, Ltd., and did not have when the alleged demand was made for inspection of the books, nor at the time of filing of the petition, but that the entire stock formerly held by them was purchased by and was then the property of defendants, F. T. Whited and H. H. Wheless, as appeared from documents annexed to petition and the letters annexed thereto. That the sum of five thousand dollars was paid in cash by defendants at the time of purchase, their notes to the order of Mrs. M. M. Bulkley, given by them in pursuance of said contract of purchase attached to plaintiffs' petition and paid as they fell due, $2,000 in addition to the $5,000 having been paid at this time. That the said

former stock of plaintiffs being now held as collateral by the National Bank of Commerce of St. Louis (as per aforesaid attached documents), could never re-invest in plaintiffs unless they became purchasers thereof.

Respondents further averred that the real and sole object of plaintiffs in desiring to inspect defendants' books was to attempt to manufacture a claim against the company defendant, and that instead of the application being on part of a stockholder and proprietor to conserve his or their interests as stockholders, it was an attempt of an alleged creditor, hostile to the corporation, intending to harass it with writs to attempt to fasten liabilities upon it and, necessarily, an attempt to injure and depress the interest of the corporation, its proprietors and its stock, and if allowed would be violative of Article 7 of the Constitution of Louisiana, Articles IV and V amendments to Constitution of the United States, work an invasion of their private affairs and business, and would work great damages to them. That the right to protect their said affairs and books was worth exceeding twenty-five hundred dollars to them.

That if the said plaintiffs had any claims against the corporation defendant, the laws of Louisiana furnished ample facilities for obtaining evidence, but not by the writ of *mandamus*.

The District Court rendered judgment in favor of the relators, P. C. Bulkley and Mary M. Bulkley, against the respondents, Whited & Wheless, Ltd. It ordered, adjudged and decreed that the *mandamus* prayed for by relators be made peremptory and the board of directors of said corporation through its proper officers were ordered to afford free access to and give permission to the relators, P. C. Bulkley and Mary M. Bulkley, or to their duly authorized agent or agent of either of them, to inspect and examine all the books, records, accounts and muniments thereto appertaining and belonging to said corporation, and which relate to the business of said corporation, as an incorporated body without unnecessarily incommoding the officers and directors of said company, and also to make copies of such papers, accounts, etc., as said relators may desire, as well as memoranda in writing relative to the same.

Defendants appealed.

OPINION.

Whited & Wheless Co., Ltd., is a corporation for manufacturing and selling lumber, organized in the parish of Bossier, in 1894, with a capital stock of thirty thousand dollars. Of this P. C. Bulkley, one of the

relators, owned five shares, his wife, Mary M. Bulkley, the other relator, owned ninety-five shares, making a total of one hundred shares held by them.

The balance of the stock was held by F. T. Whited and H. H. Wheless, one hundred shares each. The stock continued in this way until July 1st, 1899, when P. C. Bulkley, for himself and as agent of his wife, entered into the following agreement:

"This agreement this day made, this first day of July, 1899, between Mary M. Bulkley, wife of P. C. Bulkley, by the said P. C. Bulkley, her agent and attorney in fact, and the said P. C. Bulkley, parties of the first part, and H. H. Wheless and F. T. Whited, parties of the second part, to-wit:—

"That parties of the first part have agreed to sell to parties of the second part and parties of the second part have agreed to buy from parties of the first part, one hundred shares of stock of the company, of Whited & Wheless, Ltd. (5 of said shares now standing in the name of Mary M. Bulkley on the books of the corporation) upon the following terms and conditions:—

"The price to be paid for said shares is $25,000, payable as follows: $5,000 upon the execution of this agreement, the receipt of which is hereby acknowledged; $6,000 in 12 equal payments of five hundred dollars each, payable on or before the tenth day of each month for one year, commencing Aug. 10th, 1899, for the first payment; balance of $14,000 to be paid in fourteen equal instalments of one thousand dollars each, payable on or before the tenth day of each and every month for fourteen months, commencing Aug. 10th, 1900. All of these deferred payments to be evidenced by the joint notes of the parties of the second part, conditioned for the payment of the amounts on or before the dates herein specified at the Bank of Commerce, St. Louis, Mo., with interest at the rate of eight *per cent. per annum,* and with the provision that if the parties of the second part neglect or refuse to pay three or more of said notes when the same shall become due and payable, then and in that case all the notes remaining unpaid, with interest thereon, shall by reason of said default become due and payable.

"It is further agreed between the parties to these presents that the stock agreed to be sold shall remain standing in the names of the present holders until the purchase price and interest is fully paid, and for mutual protection of both parties the stock with power of attorney to transfer duly signed, and all notes above described duly signed, shall

be placed in the National Bank of Commerce in St. Louis, Mo., in Escrow, the stock to be delivered to parties of the second part when the purchase money is fully paid with interest, and not otherwise.

"The title of the stock to remain in the present holders until the purchase price is fully paid. But the parties of the first part hereby agree that they will not claim the right to vote the whole or any part of the stock herein mentioned without default is made in the payments and the whole of the purchase money not paid becomes due as provided for in this contract.

"And it is further agreed between parties to the instrument that should default be made as hereinbefore recited, so that all the notes remaining unpaid shall become due and payable, then and in that case the parties of the first part may, after five days' public notice published in a newspaper in the city of St. Louis, Mo., sell at the east front door of the courthouse the one hundred shares of stock hereinbefore described, and out of the proceeds of said sale pay first the cost and expenses of sale, second apply the remaining proceeds on the payment of notes remaining unpaid, third the surplus, if any, to be paid over to parties of the second part.

"It is also further agreed that should any stock dividend be declared by the corporation of Whited & Wheless, Ltd., said stock dividend shall be placed in escrow with the National Bank of Commerce as provided for the stock hereinbefore described, and shall be held like the other security for the payment of the purchase money notes, subject to sale if default is made in the payments like the original stock or be delivered to parties of the second part upon payment of the indebtedness hereinbefore mentioned.

"To the provisions of this agreement to be performed by them both parties hereby bind themselves, their executors, administrators and assigns.

"Signed in triplicate, this first day of July, 1899.

"Attest:　(Signed)

　　　　　　　　　　"P. C. BULKLEY.
　　　　　　　　　　"MARY M. BULKLEY (by P. C. Bulkley,
　　　　　　　　　　　　　　　　"Agent and Attorney in Fact.)
　　　　　　　　　　"H. H. WHELESS,
　　　　　　　　　　"F. T. WHITED.
(Signed)　　"J. B. WHITTINGTON,
　　　　　　"S. H. DOWELL."

The notes referred to in the contract were executed to the order of Mrs. M. M. Bulkley and were deposited, together with the certificates of stock, in the National Bank of St. Louis.

The seventh article of the act of incorporation of Whited & Wheless, Ltd., declared that no transfer of stock by the holders thereof should be binding on the corporation unless said transfer was duly entered on its books. At the time of the agreement copied above, P. C. Bulkley was president of that corporation. After the execution of that act he resigned and ——————— was elected president.

On Oct. 15, 1894, Mrs. Mary M. Bulkley sold to Whited & Wheless, Ltd., for five thousand dollars to her in cash paid over, all the merchantable timber on certain described property. In a later act between the same parties, after reciting the above mentioned sale of timber for $5,000, it was agreed that the price agreed upon for the timber is 75 cents per thousand standing.

If when cut there should be more than enough to pay the $5,000 consideration, in the deed mentioned and estimated according to Doyle rule, Whited & Wheless were to pay Mary M. Bulkley in cash the difference between the total amount the timber produced and $5,000.

If the timber, when cut, measured and estimated as above provided, produced less than $5,000, the difference should be paid to Whited & Wheless, Ltd., in cash, by Mary M. Bulkley, or other timber equal in amount to supply the deficiency, if any, satisfactory to the corporation, furnished by her.

P. C. Bulkley testified that he afterwards made a verbal demand upon Mr. Wheless, the secretary, for permission to inspect the books of the corporation, but he stated he would have to see Mr. Whited before doing so; that receiving no answer he went into the office of the company and made the same demand, and they both refused; that he made the demand as a stockholder for himself and his wife; that he then made the following written demand.

"ALDEN BRIDGE, LA., Oct. 2, 1899.

"*H. H. Wheless, Esq., Secretary of Whited & Wheless, Ltd.*

"DEAR SIR—My verbal request to be allowed to examine the log and lumber books of the company, not having been complied with, I hereby make a formal demand to be allowed to examine said books. The books

referred to are those which show the log scale and lumber each month.
Very respectfully,                    "P. C. BULKLEY, *Stockholder*.
                          "MARY M. BULKLEY, *Stockholder*.
    "By P. C. BULKLEY, *Attorney in Fact.*"

    This suit followed a refusal to grant the demand made.

    Relators' demand is based upon their rights as stockholders, and it is
from that standpoint that we have to pass upon the question submitted
to us. Reference is made to a contract of sale made by Mrs. Bulkley
with the defendant company, and a copy of that contract is in the
record.

    It may be that Mrs. Bulkley may, under it, hold the defendant to an
accounting, but the time, place and circumstances under which this
can be done, are to be determined by the terms and conditions of the
contract, which, not being declared on in the present action, can not, in
this mandamus proceeding and under the pleadings, be collaterally con-
sidered.

    There is no doubt of the right of a stockholder under certain limita-
tions to demand an inspection of the books of the corporation to which
he belongs.

    We have had occasion to investigate and pass upon that question a
number of times.

    The decisions on this subject will be found reported in 13th Ann.
289; 28 Ann. 204, 426; 49 Ann. 1558; 51 Ann. 320; 50 Ann. 258, 261;
1 Rob. 470; 45 Ann. 669; 47 Ann. 1487. While stockholders are not
owners of the corporate property and they are distinct individually
from the corporation itself, their connection with its property is closely
akin to ownership.

    They are not creditors of the corporation though they are sometimes
spoken of as such. It is upon their *quasi* ownership in the corporation
that their right of inspection is based. The disputed point in this liti-
gation is whether relators are stockholders or not.

    Relators deny that they have sold their stock to Whited & Wheless.
They contend that the contract between them was a mere agreement to
sell or a conditional sale, while defendants insist that the contract was
one of sale.

    Our law recognizes promises of sale, conditional sales and sales with
earnest.

Art. 2439 of the Civil Code defines a sale as an agreement by which one gives a thing for a price in current money and the other gives a price in order to have the thing itself. That three circumstances concur to the perfection of the contract, to-wit: The thing sold, the price, and the consent, and Art. 2456 declares that the sale is considered to be perfect between the parties and the property is of right acquired to the purchaser, with regard to the seller as soon as there exists an agreement for the object and for the price thereof, although the object has not been determined nor the price paid.

A careful consideration of the written terms of the written contract between the parties satisfies us that it evidences a completed sale, and that the stipulations which relators depend upon as going to show the contrary, the placing of the notes and the certificates of the stock in the hands of the National Bank of Commerce at St. Louis, are mere stipulations which the parties had the legal right to stipulate, to safeguard their respective interests, until the obligations of the contract should be finally performed, and not matters holding the completion of the contract in abeyance.

The price between the parties was fixed, the object sold was fixed, and the consent of the parties to a sale, we think, clearly shown by the written contract. The seller seems to have feared that a delivery of possession of the certificate of stock to the purchasers, while a portion of the price was unpaid, might enable them, either designedly or in spite of themselves, to prejudice the vendors' rights, while the purchasers saw possible dangers to themselves should they permit the vendor to have possession of their notes while he also held the certificate of stock.

The parties therefore resorted in the premises to what is styled an escrow, which we understand was nothing more than a deposit in the hands of a third party, charged with the duty of delivering the notes and the certificate as the obligations of the different parties matured. Neither party could withdraw the instrument from the hands of the depository. There was not only a sale of the stock, but a pledge of the same to secure the payment of the price by delivering to a third person agreed upon between the parties. C. C. 3162.

Parties are at liberty to make contracts, so long as they are legal, and to agree upon accidental stipulations; but where they actually make a contract with fixed legal essentials they are powerless to control

the legal effect of the contract itself—the contract being made, the law governs its results. Cooley vs. Broad, 29th Ann. 347.

The Supreme Court of the United States had occasion in Heryford vs. Davis, 102 U. S. 235, to construe a contract containing clauses very similar to those in the contract we are now considering, though the contention in that case was between a creditor of the vendee and the vendor, and not the parties themselves, as in this litigation.

Speaking of the construction of the contract in that case the court said: "It is not to be found in any name, which the parties may have given to the instrument, and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account * * *"

"It appears equally clear to us that the contract was not one for a conditional sale * * *"

"It is quite unmeaning for parties to a contract to say it shall not amount to a sale, when it contains every element of a sale and transmission of ownership. This part of the contract is to be construed in connection with the other provisions so that, if possible, or so far as is possible, they all may harmonize. Thus construed, it is quite plain these stipulations were inserted to enable the manufacturing company to enforce payment, not of any rent or hire, but of the selling price of the cars, for which the company took the notes of the railroad company. They were intended as additional security for the payment of the debt, the latter company assumed. This is shown most clearly by the other provisions of the contract. The notes became the absolute property of the vendors. As has been stated, they all fell due within four months and it was expected they would be paid. The vendors were expressly allowed to collect them at their maturity, and it was agreed that whatever sums should be collected on account of them should be retained by the vendors for their own use.

"No part of the money was to be returned to the railroad company, in any event, not even if the cars should be returned. On the contrary, it was stipulated expressly that if the manufacturing company should elect to take the cars into their own possession, which they reserved the right to do in case of default of payment of the notes, the property should be sold, and of the net amount realized from the sale so much as should be needed to make the amount remaining due and unpaid on

the promissory notes with the interest that might have accrued thereon, should be retained by the manufacturing company, and the surplus, if any, should be paid over to the railroad company.

"What was this but treating the notes given for the sum agreed to be the price of the cars as a debt absolutely due to the vendors? What was it but treating the cars as a security for the debt? And why stipulate that the surplus, which might be obtained for the sale of the cars after taking them back beyond what was needed to pay the unpaid part of the debt should be paid over to the railroad company, if that company was not the owner of the cars even while they were in the possession of the other company, and had not even then what may be called an equity of redemption?

"In view of these provisions we can come to no other conclusion than that it was the intention of the parties, manifested by the agreement, the ownership of the cars should pass at once to the railroad company, in consideration of their becoming debtors for the price. Notwithstanding the efforts to cover up the real nature of the contract, its substance was an hypothecation of the cars to secure a debt due to the vendors for the price of a sale. The railroad company was not accorded an option to buy or not. They were bound to pay the price either by paying their notes or surrendering the property to be sold in order to make payment. This was in no sense a conditional sale. This giving the property as a security for the payment of a debt is the very essence of a mortgage which has no existence in a case of conditional sale.

"It may be added that the notes were given to the vendors before the cars were delivered. So, also, the collaterals for the notes were taken before the delivery and when they were taken the president of the manufacturing company acknowledged he received them, not as additional security for the restoration of the cars at any time thereafter when demanded, but as security for the notes given in payment for the cars. This is confirmatory of the construction we have given to the contract. It tends to show that the transaction was a sale by which the ownership passed to the railroad company, the vendees retaining only a lien for the consideration." P. 246.

We are satisfied the contract between the relators in this case and Whited & Wheless was a contract of sale, not a promise of sale.

The clause in the defendants' charter as to any transfer of stock not being binding upon it until it was placed upon its books was for the protection of the company, not to extend or maintain rights which the

original owner of the stock had parted with in favor of a third person.

Entertaining the views we do as to the rights of the parties, we are of the opinion, the judgment appealed from is erroneous and that it should be annulled and reversed.

For the reasons assigned it is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby annulled, avoided and reversed, and that relators' demand as made in this action be and the same is rejected.

Mr. Justice Blanchard dissents on the authority of Burdette vs. Gas Light Company, 49th Ann. 1556, and State *ex rel.* Burke vs. Citizens' Bank of Jennings, 51st Ann. 426.

Rehearing refused.