(46 South. 193.)

No. 16,889.

BARBER ASPHALT PAVING CO. v. ST. LOUIS CYPRESS CO., Limited.

(March 30, 1908.)

SALES — CONDITIONAL SALES — RETENTION OF TITLE.

A so-called conditional sale, or sale by which the vendee is to become at once unconditionally bound for the price, and the vendor is to continue to be owner of the property until the price is paid, is not possible under the laws of this state. A petition wherein the vendor under such a contract claims the ownership of the property sold shows no cause of action.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 1336–1352.]

(Syllabus by the Court.)

Case Certified from Court of Appeal, Parish of Iberville.

Action by the Barber Asphalt Paving Company against the St. Louis Cypress Company, Limited. Judgment for defendant, and plaintiff appeals. Case certified by Court of Appeal. Instruction that petition shows no cause of action.

White & Thornton & Holloman and Paul Geddes Borron, for appellant. Edward Blount Talbot, for appellee.

PROVOSTY, J. Asking for instructions, the Court of Appeal of the First circuit for the parish of Iberville submits to this court the question whether a cause of action is

shown by a petition wherein the petitioner claims the ownership of a steam shovel, alleging that petitioner sold the same to one Hoyt for $1,200, payable one-fourth cash and balance in three equal instalments at 30, 60, and 90 days, with a stipulation that the property should remain petitioner's until final payment; and that Hoyt paid the cash part of the price; but that, without having paid the credit part, he sold the shovel to the defendant.

The contention for the petitioner is that under the express terms of the contract the payment of the entire price was a condition precedent to Hoyt's becoming owner, and that inasmuch as the condition was never fulfilled he never became owner, and, in consequence, the sale to defendant was of the property of another, and null.

The contention of defendant is that Hoyt became owner notwithstanding the express stipulation to the contrary.

The object which the parties desired to accomplish by this contract is obvious. Hoyt desired to have the steam shovel, and plaintiff desired to have the price of it. That is to say, they desired to enter into a contract by which plaintiff should give the steam shovel to Hoyt, and Hoyt should give plaintiff the price; or, in other words, they desired to enter into a contract of sale; which is defined by the Code to be "an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself." Article 2439.

In order that there should be a giving in the sense of this article, or, in other words, in order that there should be a sale, it is not necessary that the thing which forms the object of the sale should be actually delivered or the price paid. This is explained in another article of the Civil Code:

"Art. 2456. The sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid."

Plaintiff did, however, actually deliver the property, and Hoyt paid a part of the price. Nothing is said in the petition concerning possession, but from the fact that plaintiff is suing for possession and is not complaining of defendant's having acquired possession by undue means, the implication is that possession was delivered by plaintiff to Hoyt and by Hoyt to defendant, and that these deliveries were in pursuance of the two contracts of sale.

Had Hoyt paid the entire price in cash, no difficulty would have arisen in connection with this transaction. But he was either unable or unwilling to do this, and the sale was made to him partly on credit, and the plaintiff company stipulated that it should continue to be owner of the property until the entire price should have been paid. The purpose of adding this stipulation is as obvious as that of entering into the contract. It was simply and purely to procure greater security to plaintiff for the payment of the price, and merely by way of an accessory agreement—precisely as a mortgage would have been stipulated if the property had been real estate on which it would have been possible to give a mortgage.

The plaintiff company is not now suing to set aside the contract, or in disaffirmance of it; it has not offered, and is not now offering, to return the money received; its position is that the contract can, and should, be enforced as made—that is to say, that Hoyt should owe the price without having ever become the owner of the thing; and that it, plaintiff company, should be held to have continued to be owner of the thing and yet to have become the creditor of Hoyt for the price.

Such a contract appears to us to be legally impossible. But we must acknowledge that it has been sustained by the Supreme Courts of a great many, if not of all, of the other

states, and has been given recognition in one case by this court, and, in a measure, has been approved by the Supreme Court of the United States.

The decision of this court to which we have reference is that in the case of Baldwin v. Young, 47 La. Ann. 1466, 17 South. 883, where such a stipulation of continued ownership was given effect. It may be well to add, however, that in that case the question of the validity of such a stipulation was not put at issue, and was not discussed; the court expressly and significantly stated, in the course of the opinion, that there was in the case "no controversy on the question of the ownership of the heater."

In the cases of Bulkley v. Whited & Wheless, 104 La. 125, 28 South. 922, Adams Mach. Co. v. Newman, 107 La. 702, 32 South. 38, and Forsman v. Mace, 111 La. 28, 35 South. 372, the court pronounced against the efficacy of such a stipulation.

In the first of these cases, the facts were that Bulkley had agreed to sell, and Whited & Wheless to buy, certain shares of stock, part cash and part credit, the credit part to be evidenced by interest-bearing notes of the purchaser maturing at fixed intervals, with the stipulation that the title to the stock was to remain in the vendor until the purchase price was fully paid, and should continue to stand on the books of the company in the name of the vendor, and that "for the mutual protection of the parties" the stock, as well as the notes given for the purchase price, were to be placed in escrow, the stock to be delivered to the purchaser after full payment of the purchase price, and not otherwise; default on any one of the notes to cause all those yet unpaid to become exigible, and in that contingency the vendors to have the right to sell the stock, and with the price thus obtained to pay the notes, any surplus to belong to the purchaser. It was further stipulated that the dividends accruing on the stock should be in like manner placed in escrow, "and shall be held like the other security for the payment of the purchase notes." The notes were duly executed, and both they and the stock were placed in escrow as agreed. Later, Bulkley sought to exercise the right of a stockholder, founding himself on his continued ownership of the stock. The court said: "The disputed point in this litigation is whether relators are stockholders or not. Relators deny that they have sold their stock. They contend that the contract is an agreement to sell or conditional sale." The court held that the contract was a sale, and that the ownership had passed. The court said:

"Parties are at liberty to make contracts so long as they are legal, and to agree to accidental stipulations; but where they actually make a contract with fixed legal essentials they are powerless to control the legal effect of the contract itself. The contract being made, the law governs its results"—citing Cooley v. Broad, 29 La. Ann. 347, 29 Am. Rep. 332, and Herryford v. Davis, 102 U. S. 235, 26 L. Ed. 160.

In the case of Adams Mach. Co. v. Newman, 107 La. 702, 32 South. 38, the facts were that the plaintiffs had sold certain machinery, part cash and part on a credit represented by interest-bearing notes of the purchaser maturing at fixed intervals, and the machinery had been installed by their vendee on his plantation, and the plantation, with the machinery on it, had been subsequently mortgaged to the defendant, and the defendant had foreclosed his mortgage and bought the plantation, including the machinery. Plaintiffs contended that their sale of the machinery had been conditional upon payment of the price, and that the price had never been paid, and that consequently they had continued to be owners. The contract of the plaintiff with their vendee recited that the vendee owed them certain notes given for the purchase price of the machinery, and that to secure the payment of the notes the vendee put the machinery in the hands of a trustee named in the contract, and that in case of default on any one of the

notes, then all the unpaid notes were to become exigible, and that the trustee should sell the machinery, and with the price thus obtained should pay the notes and give the vendee any balance that might remain. Said the court: "The contract is a present sale intended to be and actually accompanied by possession on the part of the purchaser. * * * It is impossible for a contract to be at one and the same time a contract of entirely different and conflicting characteristics. * * * It was beyond the power of plaintiffs to make a contract of absolute sale of the machinery, and withdraw from such sale the effects fixed and flowing from it by virtue of the law itself."

In the case of Forsman v. Mace, 111 La. 28, 35 South. 372, the plaintiff had sold defendant a logging contract and a logging outfit for carrying out the contract, and defendants had obligated themselves to carry out the contract. The sale was all on credit, and interest-bearing notes were given for the price, maturing at fixed intervals. There was not a separate price for the logging contract and the outfit, but a lump price for both. There was a stipulation that in case of failure on the part of the purchasers to carry out fully the logging contract or to pay promptly any of the notes, all the unpaid notes should become exigible, and the vendors should have the option either to enforce payment of the notes, or to take back the logging outfit and carry out the contract, and in the latter event any sums paid by the purchasers should be forfeited by way of liquidated damages. The suit was on the notes, and the defense was that they were not due because there had been no sale. The court held that the contract was a sale, and that the price was due. The case really presented no difficulty, since, in all such cases of conditional sales, the option is left with the vendor to treat the transaction as an absolute sale.

In the cases of Bulkley v. Whited & Whe-

less and Adams Mach. Co. v. Newman this court founded itself in a great measure upon the decision of the Supreme Court of the United States in the case of Herryford v. Davis, 102 U. S. 235, 26 L. Ed. 160.

The contract in that case was in its terminology a mere lease, and the notes were said to have been executed for the hire of the property, which consisted of a lot of railroad cars. The lessee was to have the right to purchase the cars at any time before the maturity of the last note, by paying all the notes; but in the meantime was to be a mere lessee, with "no right, title, claim, or interest" in the cars, "except as to their use or hire." The case arose upon the seizure of the cars at the suit of a creditor of the vendee or lessee; and the vendor or lessor enjoined the seizure claiming ownership. The court held that the contract was a sale. The court said:

"What, then, is the true construction of the contract? The answer to this question is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provision it contains disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole that is to be sought for. The form of the instrument is of little account. Though the contract industriously and repeatedly spoke of loaning the cars to the railroad company for hire for four months, and delivering them, for use for hire, it is manifest that no mere bailment for hire was intended. No price for the hire was mentioned or alluded to, and, in every bailment or letting for hire, a price or compensation for the hire is essential. * * * One of these notes fell due only nine days after the cars were delivered, and both the others before the expiration of four months from the agreement. The notes were to be collected at maturity, and thus it was contemplated that, before the end of four months, the manufacturing company should have in hand in cash the full value or price of the cars. It is needless to say that all this is totally inconsistent with the idea that the parties intended a mere letting or bailment for hire."

The court then recites the clause by which the lessee was to have the right to purchase the cars in the meantime were to remain the

property of the lessor or vendor, and then continues:

"If this were all, it would necessarily be held that a conditional sale was intended. But it is not all. It is quite unmeaning for parties to a contract to say it shall not amount to a sale, when it contains every element of a sale, and transmission of ownership. This part of the contract is to be construed in connection with the other provisions, so that if possible, or so far as is possible, they all may harmonize. Thus construed, it is quite plain these stipulations were inserted to enable the manufacturing company to enforce payment, not of any rent or hire, but of the selling price of the cars for which the company took the notes of the railroad company. They were intended as additional security for the payment of the debt the latter company assumed. This is shown most clearly by the other provisions of the contract. The notes became the absolute property of the vendors. As has been stated, they all fell due within four months, and it was expected they would be paid. The vendors were expressly allowed to collect them at their maturity, and it was agreed that whatever sums should be collected on account of them should be retained by the vendors for their own use.

"No part of the money was to be returned to the railroad company in any event, not even if the cars should be returned. On the contrary, it was stipulated expressly that if the manufacturing company should elect to take the cars into their own possession, which they reserved the right to do in case of default of payment of the notes, the property should be sold, and of the net amount realized from the sale, so much as should be needed to make the amount remaining due and unpaid on the promissory notes, with the interest that might have accrued thereon, should be retained by the manufacturing company, and the surplus, if any, should be paid over to the railroad company.

"What was this but treating the notes given for the sum agreed to be the price of the cars as a debt absolutely due to the vendors? What was it but treating the cars as a security for the debt? And why stipulate that the surplus which might be obtained from the sale of the cars, after taking them back, beyond what was needed to pay the unpaid part of the debt, should be paid over to the railroad company, if that company was not the owner of the cars, even while they were in the possession of the other company, and had not even then what might be called an equity of redemption?"

To our minds the reasoning here is unanswerable; and in our humble opinion the subsequent decision of the same high tribunal in the case of Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285, founded exclusively upon authority, and not, as in the prior decision, upon an analysis and application of the essential legal principles involved in such a matter, is not near so satisfactory. Be that, however, as it may, in this subsequent decision the court held such a stipulation of continued ownership to be perfectly valid, and gave full effect to it. The latter decision did not purport to overrule the former; and in the still subsequent case of Chicago, etc., v. Merchants' Bank, 136 U. S. 281. 10 Sup. Ct. 1002, 34 L. Ed. 353, the court undertook to reconcile the two decisions by saying that in Harkness v. Russell "the agreement was upon the express condition that neither the title, ownership, nor possession of the engine and sawmill which was the subject of the transaction should pass from the vendor until the note given by the vendee for the stipulated price was paid."

In this last-mentioned case the court held the sale to have been absolute, and the sole effect of the stipulation of continued ownership to have been to create a mortgage. The court said:

"The agreement that the title should remain in the payee until the notes were paid—it being expressly stated that they were given for the price of the cars sold by the payee to the maker, and were secured equally and ratably on the property—is a short form of chattel mortgage. The transaction is, in legal effect, what it would have been if the maker, who purchased the cars, had given a mortgage back to the payee, securing the notes on the property until they were all fully paid. The agreement, by which the vendor retains the title and by which the notes are secured on the cars, is collateral to the notes, and does not affect their negotiability. It does not qualify the promise to pay at the time fixed, any more than would be done by an agreement, of the same kind, embodied in a separate instrument, in the form of a mortgage. So far as the notes upon their face show, the payee did not retain possession of the cars, but possession was delivered to the maker. The marks on the cars showed that they were to go into the possession of the maker, or of its transferee, to be used. The suggestion that the maker could not have been compelled to pay if the cars had been destroyed before the maturity of the notes is without any foundation upon which to rest. The agreement cannot properly be so construed. The cars having been sold and delivered to the maker, the payee had no interest remaining in

them except by way of security for the payment of the notes given for the price. The reservation of title as security for such payment was not the reservation of anything in favor of the maker. but was for the benefit of the payee, and all subsequent holders of the paper. The promise of the maker was unconditional."

In the case of Segrist v. Crabtree, 131 U. S. 292, 9 Sup. Ct. 689, 33 L. Ed. 127, the same court, dealing with such a conditional sale, and referring to the vendors, said:

"The court below properly held that they could not rightfully retake the cattle while they retained the notes."

There can be no doubt, then, that the Supreme Court of this state has pronounced against the validity of such a stipulation of continued ownership, and that the Supreme Court of the United States is in a measure committed to the view that the effect of such a stipulation is not to prevent the title from passing to the purchaser, but merely to create a mortgage back to the vendor. A contract of the latter kind is, as a matter of course, not possible under our law, since our law does not recognize the validity of a mortgage on movables—that is to say, of a contract as an effect of which the movable which forms the subject of the contract may be followed into the hands of third persons.

The essentials of a sale are: A thing, the property in which is transferred from the seller to the buyer; and a price in money paid or promised. Benj. on Sales, p. 2; Civ. Code, art. 2439. It follows from this that to suppose a sale without a transfer of the property in the thing which forms the object of the sale is simply to suppose an impossibility. Either, therefore, the ownership of this shovel was transferred to Hoyt, and the stipulation of continued ownership must be disregarded, or else there was no sale made to him. The latter supposition is inadmissible; because not only the allegation is that there was a sale made, but the plaintiff company has in its pocket a part of the price, and is not offering to restore it.

The rule in the interpretation of contracts is that any stipulation which is found to be inconsistent "with the intention of the parties as collected from the whole instrument" must be disregarded. 9 Cyc. 583. In this case the manifest intention of the parties was that there should be a sale, and the stipulation of continued ownership is inconsistent with that intention.

The learned counsel for plaintiff suggest that the sale was under a suspensive condition, or condition precedent, the condition being the payment of the price; and that a sale under a suspensive condition does not transfer the ownership until the condition is accomplished. But the sale cannot have been under a suspensive condition; since a sale of that kind has no effect or operation, and the present sale had an effect or operation—it had the effect or operation of making Hoyt debtor of the price, and entitled to the possession of the property.

The reason why a sale under a suspensive condition does not transfer the ownership is that it is not a sale. If it was a sale, it would transfer the ownership; because a sale is a transfer of ownership, and it is nothing else. The expression "to sell," and the expression "to transfer property for a price in money," are convertible; and, as a consequence, it is no more possible to sell without transferring ownership than it is possible to sell without selling, or to transfer ownership without transferring ownership, or to do any other thing without doing it. When a sale is made under a suspensive condition, there is no sale until the condition has been fulfilled. There is merely a contract that there shall be a sale when the condition is fulfilled.

Article 2021 of the Code says that an obligation under a suspensive condition "cannot take effect," and article 2043, that it "cannot be executed," until after the happening of the event upon which it depends.

By this is meant that the obligation cannot have any effect whatever, for any purpose; in other words, that, strictly or logically speaking, it does not exist.

From the days of Justinian, the civilians have recognized that an obligation contracted under a suspensive condition, or condition precedent, does not exist before the fulfillment of the condition:

"Sub conditione stipulatio fit, cum in aliquem casum differtur obligatio, ut, si aliquid factum fuerit, vel non fuerit, committatur stipulatio; veluti, si Titius consul factus fuerit, quinque aureos dare spondes? Si quis ita stipuletur, si in capitolium non ascendero, dare spondes? perinde erit, ac si stipulatus esset, cum morietur, dari sibi. Ex conditionali stipulatione tantum spes est debitum iri; eamque ipsam spem in hæredem transmittimus, si, priusquam conditio existat, mors nobis contigerit." Institutes, Lib. III. Tit. xvi, § iv.

We have transcribed the foregoing from Cooper's Justinian (1st Ed.) p. 250, where the text is translated as follows:

"A stipulation is conditional, when an obligation is referred to an accident, and depends upon some thing to happen or not to happen, before the stipulation can take effect; for instance, do you promise to pay me five aurei, if Titius be made consul? Or do you promise to pay me five aurie, if I do not ascend the capitol? which last stipulation is in effect the same, as if he had stipulated that five aurei should be paid to him at the time of his death. It is to be observed that, in every conditional stipulation, there is only a hope that the thing stipulated will become due; and this hope a man transmits to his heirs, if he die before the event of the condition."

This translation is more elegant than accurate. The following would be a closer rendering of the text:

"A stipulation is made under a condition when the obligation is referred (subordinated) to some event, in such a way that the stipulation will take effect if something is done or is not done; for instance, do you promise to give me five aurei if Titius is named consul? If one stipulates as follows: Do you promise to give five aurei if I do not ascend the capitol? it will be as if the person had stipulated that the five aurei should be given him at the time of his death. From the conditional stipulation there is (results) only a hope that there shall be a debt (that a debt shall come into existence) and we transmit this hope to our heirs if death strikes us before the condition is realized."

Thus it is seen that in such a case the debt, or, in other words, the contract, or the sale, does not come into existence until the happening of the condition; and that in the meantime there is only a hope that it will come into existence.

"Qua (conditio) existente, nascitur obligatio; deficiente, nulla constituitur." Cujas, L. 71, ff. De. Cond. et Demonstr. "The condition existing, or being accomplished, the obligation is born; it defaulting (failing of accomplishment), there is no obligation."

"La condition suspensive affecte l'existence même de l'obligation, ou de la disposition." "The suspensive condition affects the very existence of the obligation or disposition." A. Carpentier et Du Saint, Rép. de Droit Français, vol. 13, p. 139, No. 155.

"The suspensive condition suspends the very existence of the obligation." Mourlon, Com. on art. 1168–1181 C. N.

"La condition suspensive est celle à la réalisation de laquelle est subordonnée la naissance d'un droit." Baudry-Lacantinerie et Barde, Traité de Droit Civil, des Obligations, vol. 2, p. 13, No. 772. "The suspensive condition is that to the realization of which is subordinated the birth of a right." Baudry-Lacantinerie et Barde, Obligations, vol. 2, p. 13, No. 772.

"Envisagées au point de vue des effets qu'elles sont destinées à produire, les conditions se divisent en suspensives et résolutoires: selon que les parties ont voulu faire dépendre d'un evenément futur et incertain, soit la formation d'un rapport juridique, soit son anéantissement ou sa résolution. (C. civ., art. 1168). Aubry et Rau, t. 4, p. 60, § 302." A. Carpentier, G. F. Du Saint Répertoire du Droit Français, vol. 13, p. 139, No. 154.

"Looked at from the standpoint of the effects they are destined to produce, conditions divide themselves into the suspensive and the resolutory accordingly as the intention of the parties has been that what shall be dependent upon the future and uncertain event shall be the formation of a juridical relation or the dissolution, or resolution, of such a relation."

"La condition est un événement futur et incertain duquel on fait dépendre l'existence du lien juridique ou de l'obligation, ou plutôt c'est une espèce de restriction qui rattache l'existence d'un rapport juridique à un événement futur et incertain. J. G. Obligat., 1099. En ce sens: Pothier, Traite des Obligat. n° 199; Demolombe, t. 25, n° 278; Demante et Colmet de Santerre, 2d edit., t. 5, n° 84 bis: Larombiere, t. 2, art. 1168, n° 1; Laurent, t. 17, n° 35; Hug., t. 7, n° 240; Baudry-Lacantinerie et Barde, t. 2, Nos. 743 et seq." Dalloz Code Annoté Nouveau Code Civil 111, p. 2, No. 27.

"A condition is a future and uncertain event upon which is made to depend the existence of a juridical tie or obligation, or rather it is a

kind of restriction which subordinates the existence of a juridical relation to a future and uncertain event."

"La relation à un événement consommé, mais inconnu des parties, peut avoir lieu, mais elle ne produit pas les effets d'une condition. Dans ce cas, l'obligation existe du jour où elle a été contractée; tandis que, si l'événement est futur, l'obligation n'a d'existence qu'après l'accomplissement de la condition. J. G. Obligat. 1104, J. G. S. eod. Vo. 416. Larombiere, t. 2, art. 1181, No. 2; Demolombe, t. 25, Nos. 296 et 413; Demante et Colmet de Santerre, 2 edit., t. 5, No. 86 bis, et 100 bis, 1; Larombiere, Laurent, Hug, Baudry-Lacantinerie et Barde, loc. cit." Dalloz, Nouveau Code Civil, 111, p. 3, No. 55.

"The relation may be to an event which, unknown to the parties, has already happened; but it does not in such a case produce the effect of a condition. In such a case, the obligation exists from the day it was contracted; whereas, in the case of a future event, the obligation has any existence only after the accomplishment of the condition."

"La condition s'exprime par la conjonction 'si': Si le navire l'Algérie arrive d'Italie. Si vous faites ou ne faites pas telle chose. Cette conjonction est la seule qui exprime la condition clairement et sans équivoque. Toullier, t. 6, n. 510; Duranton, t. 11, n. 40; Larombiere, sur l'art. 1168, n. 13." A. Carpentier, G. F. du Saint Répertoire du Droit Français, vol. 13, p. 132, No. 33.

"A condition is expressed by the conjunction 'if': If the ship arrives from Italy. If you do, or abstain from doing, such a thing. This conjunction is the only one which expresses the condition fully and unequivocally."

The second paragraph of article 2043, Civ. Code, relating to an obligation contracted under a suspensive condition, provides that "the obligation cannot be executed till after the event." Commenting on this language Marcadé (article 1181, C. N.) says:

"The second paragraph of our article is not very exact when it gives as a characteristic of the truly conditional obligation the circumstance that it 'cannot be executed till after the event.' This characteristic is that of the obligation at a term, which comes into existence immediately, but can be executed only after the time agreed upon. With regard to the conditional obligation, what should have been said is that it exists only after the accomplishment of the condition."

Article 2044, Civ. Code, relative to sales made under a suspensive condition, provides that "if the thing be entirely destroyed [before the event happens] without the fault of the debtor, the obligation is extinguished."

Marcadé, commenting on a similar provision of the Code Napoleon, art. 1182, says:

"Our article does not express itself correctly when it says that the obligation of the vendor will be extinguished: The obligation cannot be extinguished, since it has never existed, what ought to have been said is that this obligation, as well as that of the vendee to pay the price, can no longer come into existence."

If, then, in the instant case, the sale had been under a suspensive condition, as contended by the learned counsel for plaintiff, there would have been no sale; and while, as a consequence, there would have been no transfer of ownership, there would, for the same reason, have been no price. The fact, then, that there was a price in this case, shows that there was a sale. And if there was a sale, there was a transfer of ownership; because sale means a transfer of ownership for a price in money, and it means, and can mean, nothing else.

The supposition that the payment of the price can be made a suspensive condition, or condition precedent, to a sale, is altogether a mistaken idea. A price cannot be paid until there is a price; and there cannot be a price until there is a sale; and there cannot be a sale until the condition precedent to there being one is accomplished. The proposition of the payment of the price being a condition precedent to the sale is on a par with those of putting the cart before the horse, and of not going into water before knowing how to swim. It is the sale which creates the price; the existence of the sale is a condition precedent to there being a price. The payment of the price cannot, therefore, be a condition precedent to the existence of the sale; unless, indeed, two events can be conditions precedent to each other.

Nothing that is said in this opinion abridges in the slightest degree the liberty of parties to make such contracts as they please. But parties cannot make impossible contracts. They cannot in this state create a mortgage

upon movable property; and they cannot, in any state, make a sale which shall not transfer ownership; or make a vendee responsible for the price before there is a sale; or make a contract without mutuality of obligation.

And it is for this last reason that the present contract cannot be enforced as a mere innominate contract. Unless the one party transfers the thing, there is nothing for which the other party can bind himself to pay money. The one obligation is the juridical cause of the other. If the one party merely promises to sell, the other cannot actually buy, but can only promise to buy; and, so long as he does not actually buy, he cannot owe money. True, our Code says (article 2462) that a promise of sale amounts to a sale; but, by a settled jurisprudence, this means no more than that the contract is susceptible of specific enforcement. Girault v. Feucht, 117 La. 276, 41 South. 572. It does not mean that the buyer becomes owner of the property, or debtor for the price. Baldwin v. Morey, 41 La. Ann. 1105, 6 South. 796, and cases there cited. In a case like the present, the owner either parts with the ownership, i. e., makes a sale; or he promises to part with it upon payment of the price, i. e., makes a promise of sale. In the former event he ceases to be owner, since a sale is a transfer of ownership; in the latter event, he does not cease to be owner, but the other party does not become his debtor for money—because the corresponding obligation to a promise to sell is a promise to buy; and so long as one merely promises to buy, the only obligation incurred is that of having to buy; and not that of having bought, or, in other words, of having to pay money. Of course, one can stipulate a money penalty by way of sanction to a promise to buy; but such a stipulation would be an accessory contract to the promise to buy—that is to say, would be an entirely different contract from the one entered into in the present case. Of course, also, one can sell, or buy, an option to buy; but, again we say, this would be a different kind of contract from the one involved in the instant case.

In the case of Stevens v. Older, 26 La. Ann. 634, and Seelig v. Dumas, 48 La. Ann. 1494, 21 South. 91, the contracts in question were leases. The case of Kessler & Co. v. Manhein, 114 La. 619, 38 South. 473, involved entirely different principles.

In the case of Baldwin v. Morey, 41 La. Ann. 1105, 6 South. 796, the vendee had not bound himself to pay the price. As we understand the agreement in that case, it was that, if the vendee paid the price, there was to be a sale; otherwise, not—both parties in the meantime, to remain free. Of course, parties are at perfect liberty to make such a contract. A. and B. may agree that if A. pays B. so much money by such a day A. will become owner of the property. But such an agreement is not a contract; it is not binding upon either party. If A. wishes to make it binding upon B., he must buy from B. an option. If the parties bind themselves mutually to buy and sell, there is a promise of sale. The contract, very common in this state, by which a country merchant leases a horse or mule to one of his customers with the understanding that the customer shall have an option to buy the animal before the termination of the lease, and that then the contract is to have been a sale and not a lease, is perfectly legal. The distinguishing feature between such a contract and the one at bar is that in the one case there is only an option to pay the price, whereas in the other there is an obligation to pay it.

The learned counsel for plaintiff would distinguish the case of Bulkley v. Whited & Wheless, 104 La. 125, 28 South. 922, on the ground that in it the property which formed the subject of the sale was to remain in escrow; or, in other words, the possession of it

was not to be delivered until final payment of the price. But possession is not of the essence of sale. The parties may well agree that the vendee shall not have possession before payment of price, and yet the sale be perfect. And, in like manner, they may agree that the prospective vendee shall have precarious possession until payment of the price, and that in the meantime there shall be no sale. In like manner, the pledgee may agree that the pledgor shall hold possession for him as agent; in which case the possession is that of the pledgee and not of the pledgor. Hence, the circumstance of the delivery vel non of the possession is not one by which the existence vel non of a sale may be tested.

Nothing is said in this opinion contrary to what is said in Benjamin on Sales, p. 235 of 2d Ed. and p. 320 of 3d Ed. In the cases there supposed by Benjamin, the vendee does not become unconditionally bound for the price so long as there is no sale and no price. The cases are examples of conditional sales, and no one denies that such a thing as a conditional sale is possible. What is denied is that the vendor may sell conditionally (that is to say, not at all), while the vendee is bound unconditionally to pay the price. An example of such a lopsided contract would be if in the instant case plaintiff had said to Hoyt: We are expecting to receive a steam shovel per Str. Antilles due to arrive in this port on next Wednesday; if the steamer then arrives and if the shovel is aboard we sell the shovel to you for $1,200; you in the meantime bind yourself absolutely and unconditionally to pay the price; pay at once one-fourth of the price unconditionally—i. e., with the understanding that it is never to be returned—and bind yourself absolutely and unconditionally to pay the balance within 90 days. To such a proposition the answer would be that the vendee cannot legally bind himself absolutely and unconditionally when the vendor binds himself only conditionally.

It is a very significant fact that the Legislature has deemed it necessary to grant special authority for the making of such conditional sales in the case of "railroad and street railway equipment and rolling stock"; and that in doing so it has interpreted such contracts as creating "a lien and privilege"; and has deemed it necessary to hedge them about with divers requirements for the protection of third persons, as that the contract shall be by authentic act, and shall be recorded in a book to be kept for that purpose at the state capital. Act No. 111 of 1894, p. 149. This legislation carries with it the implication that such a contract would not be possible under our laws, if not thus specially authorized.

Another significant fact is that although the need of such so-called conditional sales must have been felt by manufacturers as keenly in France as in this country, and the pressure for making them must have been as strong, yet that, so far as the French jurisprudence shows, the lawyers of that country have never thought of advising their clients to resort to this form of contract; but have confined themselves to the contract of lease as being the only one available in such cases.

The instructions to the Court of Appeal must therefore be that the petition does not show a cause of action.

BREAUX, C. J., and LAND, J., concur.