REGAN, Judge.
Plaintiff, Frank J. Gravis, assignee of all of the stock of Sanlou Production Company, instituted this suit against the defendant, Gardner-Denver Company, endeavoring to recover the sum of $56,032.78, representing the cost of renting, shipping and installing two compressor units, which were leased from the defendant and which failed to perform satisfactorily, together with damages incurred as a result thereof. Plaintiff then asserted that gas emanating from his field in Iberville Parish, Louisiana was both lost and wasted because the machinery did not operate in conformity with *510 the defendant’s representations, and he requested that the lease between the parties be ordered cancelled.
The defendant answered and denied that the compressors were defective and insisted that the malfunctioning' thereof was caused by plaintiff’s imperfect installation of the units and his failure to properly maintain them. Then, assuming the position of plaintiff in reconvention, defendant asserted that the plaintiff was indebted unto it in the amount of $46,142, representing unpaid rentals and service charges and the cost of ultimately transporting the units back to its Dallas, Texas plant and restoring them to working condition.
From a judgment in favor of the plaintiff for $39,992.78,[1] the defendant has prosecuted this appeal.
The facts which provoked this litigation, chronologically related, are these:
In January 1958, the parties entered into a contract, whereby the defendant agreed to lease two Gardner-Denver compressor units to the plaintiff for a monthly rental of $1,033.75 per unit. This sum represented 2Yz percent of each unit’s value and the agreement afforded the lessee an option to purchase the machinery at various periods in the lease with the understanding that all rents paid would be applied to the purchase price. The lease provided that the machinery to be furnished would possess a compressing capacity of 1,762,500 cubic feet per day per unit.
The manufacturer then delivered the machinery to plaintiff’s St. Gabriel Field and supplied him with a sketch of the concrete slab that plaintiff was required to install so as to provide an adequate foundation for the equipment. The first unit, which was installed by plaintiff’s workmen, was ready to operate in February 1958. However, before it was initially operated, the manufacturer ordered one of its field engineers, Herschel Nickel, to inspect the installation thereof. Thereafter, the unit was started and it then developed that there was sand in one of the pipes which required removal before it would function normally. This was done within a period of several days, and the unit was then placed in operation.
Plaintiff’s workmen completed the installation of the second unit the following month. It was located adjacent to the first and before it was started, Charles Offer-man, another field engineer employed by the defendant, checked it in detail. Again the presence of sand was encountered and remedied. But in all other respects, Of-ferman emphasized the unit was properly installed, otherwise he would not have permitted its operation.
Approximately two weeks after the second unit was in service, a shed was constructed over all of the machinery to protect it from the elements. The roof thereof was designed to resemble an inverted “V”, and in the peak thereof three ventilators were installed, each measuring two feet in diameter. There were curtain sides attached to the shed which extended from the edge of the roof to a point between four and six feet from the ground.
From the time the units were placed in operation, plaintiff continuously experienced an overheating problem with the machinery, which resulted in its being frequently inoperative. When the machines became overheated, a thermostat would automatically turn them off so that they would not be damaged as a result thereof.
This problem was called to the attention of the Gardner-Denver representatives on innumerable occasions and the defendant dispatched several engineers who tediously endeavored to remedy the condition. The representatives offered various suggestions *511 to correct the overheating, which included removing the sides of the shed and a part of the roof so as to permit the engines to operate in a cooler atmosphere. Plaintiff complied with both suggestions; however, the condition persisted. Although he did not replace the sides thereof, he did replace that section of the roof which had been removed in order to protect the equipment from damage by the elements.
In May and June of 1958, plaintiff installed baffles on the radiators of each unit, which were intended to permit the entry of cooler air therein and also erected a water cooler as an additional precaution intended to militate against overheating. None of these measures appreciably increased .the compressing capacity thereof, but they did slightly alleviate the intensity of the problem.
On July 9, 1958, J. H. Howard, a field representative who had conducted the pre-contract negotiations on defendant’s behalf, addressed a letter to Sanlou Production Company, to the attention of Frank J. Gra-vis, wherein he recommended the installation of new fans on the units in another effort to remedy the condition. He then very pertinently wrote:
“I can understand your feelings about this unit and can assure you we are doing everything possible to straighten the matter out at the earliest possible date.”
The aluminum fans were installed in July 1958 and plaintiff continued using the units until February 1959; however, he then, out of sheer frustration, decided to replace them with another manufacturer’s equipment since the units persistently overheated and as a result thereof were thermostatically stopped, and as a consequence they never did perform in conformity with Howard’s representations to the plaintiff. The correspondence which passed between plaintiff and defendant, and which appears in the record, establishes that the defendant represented the rated capacity of the unit to be 1,762,500 million cubic feet per day, but plaintiff discovered that the actual capacity was only 567,067 cubic feet per day. This difference was obviously due to the malfunctioning and frequent shut down of the engines caused by overheating. The actual capacity was established by the testimony of William G. Blackwell, a consultant geologist and petroleum engineer who was field superintendent at the St. Gabriel Field development. Blackwell stated that this figure was computed by averaging the daily performance of eách unit over the period of time that the machines were in actual operation.
The litigants herein do not dispute the fact that the gas compressor units did not function properly nor that the- malfunction thereof resulted from overheating. However, the cause of the overheating has been the subject of much dispute. The rather voluminous record is embellished with it as were the briefs which contained a total of 139 pages. The oral argument was also largely devoted to this subject.
In order to prove that the overheating was caused by a defect in the design of the equipment, plaintiff introduced the expert testimony of John Russell Wait, Jr., a consulting pipeline engineer who has had extensive experience with Gardner-Denver compressors over a period of approximately twenty years. One of his professional functions was to supervise the installation of gas compressor units. Wait examined the compressors in the St. Gabriel Field on June 15, 1959 when they were idle, which has been the subject of criticism by defendant’s experts. He asserted that the overheating therein was caused primarily by poor design, in that the fans on each unit were blowing toward each other, causing heat currents to meet in the center thereof. This heat in turn would be recirculated through the radiators. He stated that the shed which protected the units was the usual type used to shelter compressors. He further asserted that the radiator capacity was inadequate. Although this expert did not actually operate the units, he did make a general installation inspection thereof and *512 reviewed the reports compiled thereon involving running time and breakdown of parts.
Wait explained that it was customary for a buyer to describe his needs to the manufacturer when purchasing this type of machinery and a performance guarantee is customarily one of the factors a manufacturer considers in quoting a price therefor.
A. L. Kirby, the vice president and service manager of Reagan Equipment Company, whose technicians both serviced the units and performed extensive repairs thereon, inspected them in March 1959, and on cross examination conceded that he considered the location of the radiators, which were directly opposite each other, an improper design for the reason that when the unit is housed under a shed the hot air is drawn to the center thereof and is thus recirculated through the radiators of the machines. In this respect, which is very significant, he agreed with the opinion of plaintiff’s expert, Wait.
On the defendant’s behalf, he asserted that plaintiff was not using pure water in the cooling system which caused scaling in the machinery and which might account for overheating. Further, he related that the shed was improperly constructed because the eaves thereof extended beyond the end of the radiators.
F. D. Warrington, an electrical and industrial engineer who is a special representative for the defendant, asserted that the main cause of the overheating was the fact that the units were housed under an improperly constructed shed. He related that the plaintiff had been warned of ventilation problems before the shed was erected. When he first visited the site on May 7, 1958, he recommended to plaintiff’s agent that ducts be installed to furnish better ventilation. He next visited the site on April 9, 1959, approximately one month after plaintiff had discontinued using the machinery and returned again on May 26, 1959 to test the machinery. During April or May of that year plaintiff had removed the baffles from the radiators that had been installed the previous June and the machines were tested without them. War-rington asserted that with proper ventilation the units would perform at rated capacity and he reiterated that the overheating problem had almost been solved in June 1958 with the addition of the baffles around the sides of the radiators.
Warrington emphatically denied that the manufacturer was in any way responsible for the improper construction of the metal shed, which he finally concluded was the sole cause of the overheating problem. He also discounted Wait’s theory of faulty design and criticized his opinion because Wait did not observe the units in operation.
E. A. Dietering, a petroleum engineer employed by the defendant, also disagreed with Wait’s analysis that the defect was due to the faulty design of the equipment. However, he did concede that ventilating experts often disagree sharply on whether this radiator arrangement is proper and he further conceded that it is his company’s responsibility to see that the equipment it sells does perform in conformity with its representations.
Predicated on the foregoing evidence, the trial judge concluded that “ * * * the equipment * * * did not function properly after being installed in the St. Gabriel Field; that the malfunction of the machinery was not caused by any fault of plaintiff. * * * ”, and accordingly rendered judgment in his favor.
The initial question which this appeal has posed for our consideration is whether that finding of fact is so erroneous and unsupported by the evidence as to warrant a reversal by us.
A careful review of the record discloses that the evidence fully justifies the conclusion reached by the trial court. While it is true that the experts who appeared on behalf of each litigant differed sharply as to the cause of the overheating problem, we were impressed with the testimony of Wait, *513 plaintiffs expert, who related that the design of the machinery left much to be desired, especially since A. L. Kirby, one of defendant’s witnesses, agreed that the arrangement of the machinery was not desirable when it was operated under a shed. It will be recalled that all the witnesses who testified concerning the use of gas compressors asserted that in this area it is necessary to erect a shed or shelter over the equipment in order to preserve it.
The testimony of Wait relative to the cause of overheating is additionally substantiated by the fact that plaintiff’s agents fully complied with several suggestions made by defendant’s representatives to improve the ventilation in the shed; however, none of these measures noticeably improved the performance record of the equipment. There exists no doubt that the defendant fully assumed the responsibility for effectively placing this machinery in good working order as is evidenced by the letter of J. H. Howard, defendant’s field engineer, wherein he assured the plaintiff that the manufacturer would continue its efforts to bring the actual operating capacity of the units up to the representations made by the defendant to the plaintiff when the contract of lease was confected.
Since the lease-purchase agreement which forms the subject matter of this litigation is in fact a lease,[2] the defendant’s liability herein is fixed by virtue of the rationale of LSA-C.C. Art. 2695, wherein it is provided that:
“The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.”
In view of the fact that we have concluded that the lessee was in no way responsible for the defectiveness of this equipment, the plaintiff is entitled to recover damages incurred as a result of its use.
Defendant has argued that the trial judge improperly assessed damages that were either not proven by the plaintiff or were not the responsibility of the defendant. For the sake of clarity, we shall discuss the items of damage which were awarded by the trial court separately.
Two items complained of are as follows:
Gasoline loss, 367.84 barrels at $3.09 per barrel $ 1,136.63
Loss of 309,331,000 cubic feet of gas at $90 per million 27,839.79
$ 28,976.42
Defendant insists that these items of damage were not proven by the plaintiff with that certainty that the law requires. The only testimony inscribed in the record in connection therewith is that of William Blackwell, a consulting geologist and petroleum engineer who supervised the St. Gabriel Field operation. Fie related that plaintiff was required to flare 309,331.000 cubic feet of gas because the compressors furnished by the defendant were not functioning properly. Fie asserted that had the equipment been operating at rated capacity *514 there was enough gas to be compressed. He valued the 309,331,000 cubic feet of gas at $90 per million cubic feet, which would make the total loss $27,839.79. In addition, Blackwell asserted that 367.84 barrels of distilled gas could have been derived from the flared material, which was valued at $3.09 per barrel. Thus the total loss on the distillate was $1,136.63. Blackwell related that his computations were predicated on records kept by the company and this aspect of his testimony was not contradicted. Therefore, we are of the opinion that the foregoing items of damage were proven with sufficient certainty to justify the award of the trial court.
The next award which defendant complains of as erroneous is for the sum of $6,765.07, which is the amount of the bill rendered by Reagan Equipment Company to the plaintiff for parts furnished and servicing of the compressors. Plaintiff has not paid this bill. In fact Reagan Equipment Company has instituted suit against the plaintiff to recover this sum, which he has judicially confessed in this proceeding[3] is due and unpaid. Plaintiff has asserted that all services performed by Reagan were rendered in an effort to improve the performance of the two units and bring them up to the standards guaranteed by the manufacturer. Not only does the record reflect that the Reagan company reported these defects and its efforts to remedy them to the defendant, but it also discloses that there were innumerable breakdowns of this equipment within nine months of the installation. In view of the fact that the life of this equipment is twenty years, and in normal use should require minor servicing, other than lubrication, about five days per year, the itemized statement for the foregoing services substantiates plaintiff’s insistence that the machinery was inherently defective. We therefore conclude that the lessor is responsible for the charges made by Reagan resulting from the innumerable services that the company was required to render in connection with this equipment.
Counsel for defendant argues that this award is improper since a suit is presently pending against plaintiff for the amount thereof and that no judgment has been rendered therein. In view of plaintiff’s judicial admission of this indebtedness, coupled with the request that he “be saved from loss on account of these charges”, we are of the opinion that he has, in effect, confessed judgment and he has therefore obligated himself to pay Reagan Equipment Company this . amount. Thus the award is fair and proper.
When the units were initially shipped, plaintiff agreed to pay the freight charges. He paid thereon the sum of $628.52. The trial court very properly concluded that plaintiff was entitled to recover this amount since the defendant had shipped defective equipment to him.
Defendant complains that the trial court erred in awarding to the plaintiff the sum of $17,595.27, which represents the amount that he expended in constructing the concrete foundation upon which the units were placed and the shed under which they were housed. Defendant has pointed out that the plaintiff has purchased a similar unit from the Ajax Company which is protected by at least part of this same shed and rests upon a part of the same foundation. Since the plaintiff is still using a part of both the shed and the foundation, we do not believe that the trial court should have awarded the entire cost of the installation thereof. Therefore, we conclude that this aspect of the case must *515 be remanded so as to allow plaintiff to prove with more exactness to what extent he was actually damaged by having to construct the foundation and shed. In the absence of evidence showing that plaintiff was required to unnecessarily expend a greater sum in this construction than he would have been required to expend for the installation or another similar unit or two units, we do not think that he is entitled to recover therefor. However, he must be afforded the opportunity to introduce proof in support of this item of damages.
Finally, we turn our attention to the credit that the trial court allowed to the defendant as rental for the period of time that the machinery was operative. The judge thereof concluded that the units did not function for a total of 118 days or, in other words, that they were operating for % of a year. Since the rental was $24,-810.00 annually for both units, he allowed a credit of $16,540, which represents two-thirds of the annual rental.
Counsel for plaintiff has conceded a credit was proper herein since he did derive some use from the equipment; however, the defendant asserts that the plaintiff failed to introduce one scintilla of evidence to show exactly what proportion of time the machinery was either operative or inoperative. A careful analysis of the testimony compels us to conclude that the record fully supports this contention for there is not one iota of evidence inscribed therein upon which such a credit could have been predicated. In view of the fact that several of plaintiff’s employees stated that logs were kept on the running time of each unit, we think this aspect of the case should also be remanded so that the plaintiff will be afforded an opportunity to establish the actual use he derived from each unit.
The trial court also permitted the plaintiff to recover the sum of $2,067.50, representing one month’s rent paid for the use of both units. Since we have concluded the question of rental and credits thereon to the defendant should be remanded, we believe this award should be set aside pending the determination of that issue.
Plaintiff retained possession of and used the equipment intermittently for one year, but only paid one month’s rent because he did not have money with which to make the payments. Failure by the plaintiff to pay rental was not predicated on the fact that the equipment was defective. Counsel for defendant asserts that this fact is significant in establishing that the plaintiff accepted and used the machinery and thus acquiesced in the operating capacity thereof over a long period of time without complaint.
We do not agree with this reasoning for the record clearly discloses that plaintiff fully cooperated in the defendant’s efforts to make the machinery function properly and finally discontinued its use when it became obvious that the defendant was unable to deliver the performance it had originally promised.
For the reasons assigned, the judgment appealed from is set aside and the case is remanded for the purpose of permitting the introduction of evidence to prove plaintiff’s loss, if any, resulting from the construction of the foundation and shed which housed the units; and also, the introduction of evidence to establish, if possible, the operating time of each gas compressor so that a proper credit may be allowed to the defendant for the actual use plaintiff derived therefrom, and that part of the judgment refunding rentals paid by plaintiff is set aside pending the determination of the rental issue; in all other respects, the judgment appealed from is affirmed. The assessment of costs is to await the final determination of the foregoing issues.
Affirmed in part: remanded in part.

. The trial judge concluded that plaintiff had established he was entitled to recover $56,032.78; however, he allowed the defendant a credit of $16,540, predicated upon a finding that the plaintiff had derived a benefit therefrom for % of a year.

. In the contract, the parties agreed that the plaintiff was to lease the equipment for a minimum period of three years at a monthly rental of $1,033.75 per unit. In five years time, at this rental, the lessee would have paid the value of the machines. However, the agreement included provisions whereby plaintiff would have an option to purchase, which he could have exercised at the end of any one of the five years for a price stipulated by the contract. Since the plaintiff was not obligated to pay the value of the machinery, but had a valid option to either accept or reject title, the agreement was a lease. See Barber Asphalt Paving Co. v. St. Louis Cypress, 121 La. 152, 46 So. 193, at 199 and Lee Construction Company v. L. M. Ray Construction Co., 219 La. 246, 52 So.2d 841.

. Allegation 20 of plaintiff’s petition reads in part: “Petitioner further shows that Reagan Equipment Company, distributors selected by the defendant, has rendered bills amounting to * * * ($6,765.07) * * * and though these bills remain unpaid, petitioner is entitled to judgment against the defendant for the amount thereof in order that petitioner will be saved from loss on account of these charges.”