448 So.2d 1329 (1984)
BNO LEASING CORPORATION
v.
HOLLINS & HOLLINS, INC. et al.
No. 83 CA 646.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 1984.
Writ Denied May 25, 1984.
*1330 Rodney J. Madere, Metairie, for plaintiff-appellant.
Paul C. Richard, Jr., Norco, for defendant-appellee.
Before KLIEBERT, BOWES and GRISBAUM, JJ.
KLIEBERT, Judge.
This is a devolutive appeal by BNO Leasing Corporation, plaintiff, from a judgment dismissing its suit for "termination payments" under an alleged lease of equipment entered into with Hollins and Hollins, Inc., defendant corporation, and Percy Hollins, individually, as continuing guarantor. The trial judge concluded Percy Hollins believed he was executing a "straight lease" agreement rather than one providing for "termination payments" and hence declared the agreement unenforceable for lack of consent. On appeal, plaintiff contends the trial judge erred in reaching this conclusion. Although not for the same reasons stated by the trial judge, we affirm his decision to dismiss plaintiff's claim.
Percy Hollins was a stockholder and president of the corporate defendant. He made inquiries at Orleans Coastal Equipment (hereafter supplier) relative to acquiring certain equipment and was referred by them to BNO. The defendant corporation and BNO then entered into an agreement, prepared and confected by BNO, dated October 26, 1981, referred to as a "lease", relative to a (1) John Deere 450 Dozer, (2) Worthington 165 Air Compressor, and (3) John Deere Model 350 Dozer Wide Track. Under the agreement, BNO is said to have acquired from supplier the enumerated equipment for $49,130.00 plus $2,766.02 sales tax or a total of $51,896.02. Title to the equipment remained in BNO but defendant corporation had possession and use of the equipment and was obligated to pay to BNO thirty-six monthly installments of $1,909.52 or a total of $68,742.72 and "a termination value" in the event of default or at the expiration date of the lease. The agreement contains many other provisions which are extremely difficult to read or comprehend because printed on the front and back of extremely thin and transparent paper.
Under date of October 22, 1981 (four days before the date of the above described agreement) Percy Hollins individually executed an instrument referred to as a "Continuing Guaranty" which provided that in consideration of plaintiff entering into the agreement with the defendant corporation he was giving to plaintiff his continuing guaranty to the principal amount of $51,896.02 plus interest, attorney fees, costs, etc., which might be incurred by the plaintiff.
After having made payments under the agreement over an eight month period, totalling $11,457.12, BNO contended the defendant corporation was in default for failure to timely make two of the installment payments. Thereafter, BNO requested and defendant corporation made no objection to BNO taking possession of the equipment. At BNO's request, at the time it took possession of the equipment the sales manager for Orleans Coastal Equipment (the original supplier) appraised the equipment at $34,000.00. Thereafter, BNO effected private sales of the equipment and received a total of $28,000.00 for same.
In August 1982, plaintiff brought suit against defendant corporation and Percy Hollins individually, as the continuing guarantor, for $12,708.92 plus 1½% monthly interest and 25% attorney fees. Originally, the defendants filed a general denial. Subsequently, the answer was amended to assert a lack of consent due to a misunderstanding *1331 as to the provisions of the agreement.
In his reasons for judgment, the trial judge accepted Percy Hollins' testimony that he believed he had entered into a "straight lease" (one in which he merely paid a monthly rental for the use of the equipment) rather than one in which the plaintiff could recover a "deficiency" in the event of a default. Although we also accept the testimony, we believe the trial judge erred in his ruling because Hollins testified he never read the agreement before signing it. Under the law, Hollins was not compelled to read the agreement, but since he chose not to exercise the right to read the agreement, he cannot now complain about a misunderstanding because the law holds him to the agreement the same as though he exercised his right to read it. Tweedel v. Brasseaux, 433 So.2d 133 (La.1983). Nevertheless, for the reasons which follow, we believe the trial court properly dismissed the plaintiff's claim.
Although the lease is structured with legally charged language of a lease, it does have the characteristic of a sale and a lease. Further, readily apparent, on a mere reading of the agreement, is that the design purpose of the agreement was to structure something other than the usual seller, buyer, financier relationship between the supplier, the defendant corporation, Percy Hollins and BNO in order to avoid prohibited or restricted provisions of consumer protection legislation involving the usual seller, buyer, financier relationship created by a sale and mortgage. Past efforts to structure such an agreement have on many occasions been struck down by our courts where the agreement, regardless of the terms used to confect it, was a prohibited common law conditional sale, Barber Asphalt Paving Co. v. St. Louis Cypress Co., 121 La. 152, 46 So. 193 (1908), or an effort to collect future rentals even though the lease was terminated and possession of the property returned to the lessor, 327 Bourbon Street, Inc. v. Pepe, Incorporated, 257 La. 577, 243 So.2d 262 (1971) or a creditor's effort to collect a deficiency resulting from a private, rather than a judicial, sale in violation of the Deficiency Judgment Act. LSA-R.S. 13:4106, 4107.
In concluding that the particular agreement at issue in Pastorek v. Lanier Systems Company, 249 So.2d 224 (4th Cir. 1971), though couched in terms of a lease, was a prohibited conditional sale, Judge (now Justice) Lemmon said at page 226:
"... While these parties have attempted to structure their relationships in particular ways, by designating roles through the use of legally charged language, we are bound to find the relationships as they exist and not simply as they have been described. Words will have import and can be binding only when they describe relationships which actually exist, but not when they are merely labels which are used to alter or disguise actual relationships. This does not conflict with, but actually supports, the principle that agreements legally entered into have the effect of law on those who form them, the question here being what agreements actually were entered into." Article 1901-CC
Thus, the relationship of the parties as they legally exist rather than that designated by the legally charged language in the agreement are to be applied in deciding whether BNO is entitled to the payment sought under the following termination provisions of the agreement:
29. DEFAULT BY LESSEE: If any one of the following events (each of which is called an "Event of Default") shall occur: (a) Lessee shall default in payment of any rental or other payment required hereunder when due and such default shall continue for 10 days; or (b) Lessee shall default in the payment when due of any indebtedness of Lessee to Lessor arising independently of this Lease and such default shall continue for 10 days; or (c) Lessee shall breach any warranty hereunder; or (d) Lessee shall default in the performance of any other agreement hereunder *1332 and such default shall continue for 10 days after written notice thereof to Lessee by Lessor; or (e) Lessee shall become insolvent or make an assignment for the benefit of creditors; or (f) Lessee shall apply for or consent to the appointment of a receiver, trustee, conservator or liquidator of Lessee or of all or a substantial part of its assets, or such receiver, trustee, conservator or liquidator shall be appointed without the application or consent of Lessee; or (g) any petition is filed by or against Lessee under the Bankruptcy Act, as amended, or under any other insolvency law provided for relief of debtors; then immediately and to the extent permitted by law Lessor shall have the right to exercise any one or more of the remedies hereinafter provided.
30. REMEDIES: If an Event of Default shall occur and be continuing, Lessor may give Lessee notice in writing that this Lease is in default and:
* * * * * *
b. Terminate this Lease forthwith (whereupon Lessee's right to use the Equipment shall absolutely cease, but Lessee shall remain liable as hereinafter provided and cause Lessee at its expense promptly to return the Equipment to the possession of Lessor at Lessor's current address, or Lessor may enter upon the premises where any or all items of the Equipment are located and take immediate possession of and remove the same by summary proceedings or otherwise, and thereafter hold, possess, and enjoy the same free from any right of Lessee, its successors or assigns. Lessee shall, without further demand, forthwith pay to Lessor an amount equal to unpaid rent due and payable for periods up to and including the rental period during which Lessor has declared this Lease to be in default, plus, as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the Termination Value of the Equipment as calculated pursuant to the Table attached hereto as of the period during which Lessor has declared this Lease to be in Default. Following the return of the Equipment to Lessor pursuant to this paragraph (b) Lessor may hold, possess, and enjoy free from any right of Lessee, use of the Equipment for any purpose whatever. Lessor, at its option, may either re-lease the Equipment or sell it for the best price obtainable.
All Remedies of Lessor hereunder are cumulative and in addition to any other remedies provided for by law and may to the extent permitted by law be exercised concurrently or separately. The exercise of any one Remedy shall not constitute a waiver of or preclude the exercise of any other Remedy. No failure or delay on Lessor's part to exercise any right or remedy shall operate as a waiver thereof or modify the terms of this Lease, nor shall any single or partial exercise by Lessor of any right or remedy preclude any other or further exercise of the same or any other right or remedy.
The table referred to in the above quoted provision and the one used by BNO's witness in computing its claim is as follows:

TABLE

OF

CASUALTY AND TERMINATION VALUES

Lease #
1. These Values are expressed as a percent of the Total Cost of the Equipment listed on the accompanying lease.
2. Month number 1 (one) is the month in which the Rental Commencement Date falls.
3. The Value for any month is applicable on the last day of the month and up to, but not including, the last day of the following month.
4. The Values given below have been reduced by any advance payments which have been or will be made. Advance *1333 payments will therefore not be applied to the total Rental due on any Item at the time of a Loss, nor can any advance payments be returned to Lessee without a corresponding adjustment in these Values.

Month Number Value Month Value Month Value
Commencement Date 100%
 1. 98.43 13. 75.45 25. 44.81
 2. 96.81 14. 73.19 26. 41.91
 3. 95.13 15. 70.87 27. 38.96
 4. 93.40 16. 68.50 28. 35.95
 5. 91.62 17. 66.08 29. 32.89
 6. 89.78 18. 63.61 30. 29.78
 7. 87.90 19. 61.08 31. 26.62
 8. 85.95 20. 58.50 32. 23.40
 9. 83.96 21. 55.87 33. 20.13
 10. 81.91 22. 53.18 34. 16.81
 11. 79.81 23. 50.45 35. 13.43
 12. 77.65 24. 47.65 36. 10.00
 EXPIRATION DATE -10%

When asked to explain to the court the function of the above quoted table, BNO's employee witness said:
"A. It draws out the values as to how we calculate the termination during any period over the term of the lease.
Q. In other words, if the lessee would like to terminate the lease with you and it's specificed (sic) if he so chooses to terminate that there is a value placed on that.
A. Right
Q. OK. That is made part of the lease?
A. Right."
The equipment covered by the agreement was reacquired from the defendant by an employee of the Bank of New Orleans rather than by BNO Leasing Corporation.[1] The bank employee testified that "the Bank" reacquired the equipment and at the same time he discussed with the defendant's attorney the waiver of any "deficiency" which might be forthcoming as a result of the taking of the equipment by virtue of an alleged default. He also testified that he computed the "termination value" due by the defendant by taking the original purchase price of the equipment ($51,896.02) and multiplying it by the termination percentage of value for a termination eight months after the inception of the lease (85.95%) and thus determined the termination value to be $46,708.96 (sic). To arrive at the amount claimed from the plaintiff, he subtracted from the termination value of $46,708.96 the appraised value of the equipment, $34,000.00. The difference of $12,708.96 was the amount claimed to be due by the defendant corporation and the continuing guarantor.
As we apply the above quoted provisions of the lease and termination value table to the known facts, the termination value of the equipment was $44,604.62 ($51,896.02 × 85.95%). The mathematical error in the computation of the termination value is not material. What is material is that according to the literal wording of Section 30(b), above quoted, the defendant corporation owes the full termination value, i.e., $44,604.62. We find no provision in the agreement which would entitle the defendant to a credit for the appraisal value (as the *1334 plaintiff was apparently willing to give) or for the amount which the bank received for the sale of the equipment.
Clearly, therefore, the termination payments provided for in the lease is nothing more than the guarantee of receipt by lessor from lessee of the purchase price of the equipment. It does not have the redeeming features of a terminating value table of the open end car rental lease at issue in Executive Car Leasing Company of New Orleans, Inc. v. Alodex Corp., 265 So.2d 288 (4th Cir.1972), 279 So.2d 169 (La.1972). The primary redeeming feature of that agreement was the fact that the lease was an open end lease (no fixed termination date) and the termination value escalated upwards or downwards depending on the condition of the vehicle (as established by a sale) at the time the lessee elected to terminate the lease. The termination value computation was triggered by the exercise of the lessee's right to terminate the lease and the termination value was in fact additional rental for the period the vehicle was under lease. Here, however, the plaintiff's effort to give a credit for the appraisal value of the equipment, although not required by the provisions in the agreement, was an effort to try to validate a transaction which was invalid on its face.
Additionally, the lease contains a provision (Paragraph No. 4) which provides that if the equipment fails to perform, the defendant corporation's remedy is against the supplier, not BNO. This clause evidences an intent on BNO's part to function as a financing agent and not as a lessor as contemplated by our Civil Code and is in conflict with its characterization in the agreement as an owner-lessor. We know of no legal basis by which a lessor can shift his legal responsibility to deliver, maintain and/or warrant the thing leased to a third party and still effect a contract of lease. Under the provisions of LSA-C.C. Articles 2692 and 2693, the essence of a contract of lease is to impose this responsibility and obligation on the one seeking to be a lessor.
The continuing guaranty agreement executed along with the principal agreement manifest an intent or understanding different from a conventional lease obligation. It provides in part as follows:
"In consideration of BNO LEASING CORPORATION, of New Orleans, Louisiana (hereinafter called "Lessor") at my request entering into a lease with Hollins & Hollins, Inc. (hereinafter called "Lessee"), I hereby give this continuing guaranty to the said Lessor, its transferees or assigns, for the payment in full, together with all interest, fees, and charges of whatsoever nature and kind, of any indebtedness, direct or contingent whether secured or unsecured, of said Lessee, to said Lessor up to the principal amount of Fifty One Thousand Eight Hundred Ninety Six and 02/100 Dollars, plus all interest, attorney's fees, costs, etc., which may be incurred by said Lessee, whether due or to become due, and whether now or existing or hereafter arising."
The binding language of the guarantee provides as follows:
"I do furthermore bind and obligate myself, my heirs and assigns, in solido with said Lessee, for payment of the said indebtedness precisely as if the same had been contracted and was due or owning by me in person, hereby agreeing to and binding myself, my heirs and assigns, by all terms and conditions contained in any note or notes signed or to be signed by said Lessee, making myself a party thereto; hereby waiving all notice including notice of any such indebtedness and of demand, presentment, protest or notice of demand or non-payment and of notice of any act to establish the liability of any party on any commercial or other paper, indebtedness or obligation covered by this guaranty."
This is not a guarantee of rentals payment or rental notes but, rather, a guarantee of the payment of the purchase price of the equipment plus finance charges and attorney fees as they may become due.
We agree with the holding in Executive Car Leasing v. Alodex Corporation, *1335 supra, but the agreement involved there was not the one involved here. Rather, the one involved here is exactly the type Justice Tate had reference to when he said [in Executive, supra] he was not faced with what is denoted as a lease but in fact established a buyer-seller or lender-borrower relationship or one which sought to collect future rentals in the guise of additional compensation for the use of the vehicle during the leased months. Here the agreement in fact contemplates a buyer-seller relationship and since title is retained by BNO is a prohibited conditional sale. Lee Construction Co. v. L.M. Ray Const. Corp., 52 So.2d 841 (La.1951). Further, since BNO received the equipment and sold it, its effort here is an effort to collect a deficiency resulting from a private, rather than a judicial, sale in violation of the Deficiency Judgment Act (LSA-R.S. 13:4106, 4107). Additionally, even if we characterized the agreement as establishing a valid lessor-lessee relationship the termination of value provision would have to be construed as a prohibited effort to collect future rentals even though the property has been received and disposed of by BNO. See Weil v. Segura, 178 La. 421, 151 So. 639 (1933). Also, since the continuing guarantee agreement was confected and executed prior to the principal agreement, even if construed as a surety agreement for future rentals, it would be unenforceable. (LSA-C.C. Article 3035). For those reasons, therefore, we hold the trial judge properly dismissed the plaintiff's claim.
All costs to be borne by the plaintiff.
AFFIRMED.
NOTES
[1] Although not reflected by the record, it is apparent the bank and the plaintiff are affiliated corporations. The basis for the bank taking steps to terminate the lease because of an alleged default rather than the plaintiff is not reflected by the record.