**MODERN FARM SERVICE, INC.,**
**Appellant,**
**v.**
**BEN PEARSON, INC., Appellee.**
**No. 19008.**

United States Court of Appeals
Fifth Circuit.
Sept. 18, 1962.

---

4. Link v. Wabash, 1962, 370 U.S. 626, 630–632, 82 S.Ct. 1386, 8 L.Ed.2d 734.

Percy J. Landry, Jr., Baton Rouge, La., for appellant.

C. E. Laborde, Jr., Marksville, La., Frank E. Chowning, Little Rock, Ark., Edwin L. Lafargue, Marksville, La., Moore, Chowning, Mitchell, Hamilton & Burrow, Little Rock, Ark., Laborde, Lafargue & Brouillette, Marksville, La., for appellee.

Before HUTCHESON, CAMERON and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This is a suit on two notes secured by chattel mortgages executed by Defendant-Appellant, Modern Farm Service, Inc., in favor of Plaintiff-Appellee, Ben Pearson, Inc., representing the sale of two cotton picking machines. In answer to the original suit, Modern Farm denied liability; and in addition, filed a counter-claim for the purchase price of six additional pickers sold to it by Ben Pearson. The court, without a jury, rendered judgment in favor of Ben Pearson on the notes in the amount of $4,772.00 plus interest and attorneys' fees, and found against Modern Farm on the counter-claim.

Ben Pearson, Inc. is an Arkansas corporation domiciled at Pine Bluff, Arkansas, and holds the patents to and is the manufacturer of the Rust Cotton Picker. Modern Farm Service, Inc. is a Louisiana corporation domiciled at New Roads, Louisiana, and is engaged in the retail sale of farm machinery and supplies.

On June 28, 1951, J. B. Lancaster, President of Modern Farm, wrote the following letter to Ben Pearson:

"We note in the Implement & Tractor Directory, 1951 Edition that (you) manufacture the Rust Cotton Picker.

"It will be appreciated if you will send us information regarding this cotton picker, including any literature that might give us an idea as to whether it is tractor mounted or pulled, or one-row or two-row, etc., as well as price.

"My son expects to pass near Pine Bluff about July 9 or 10 and if your machine appears to be adaptable to conditions in this area he will stop in to see you."

Thereafter, in 1953 or early 1954, a salesman representing Ben Pearson made two or three calls on Modern Farm with the result that J. B. Lancaster, Jr. took a Minneapolis-Moline tractor to the plant in Pine Bluff, Arkansas and Ben Pearson agreed to adapt one of its standard Rust Cotton-Picking units to said tractor. It was a custom of the farmers in Modern Farm's area in New Roads, Louisiana, to plant cotton on rows 5½ feet apart, and the Rust Cotton Picker was designed to fit normal rows 3½ feet apart. A special wide frame on the tractor was proposed in order to compensate for the unusually wide rows in New Roads, Louisiana.

A contract for the sale of this specially built machine was entered into by the parties. An express warranty was attached to the order as follows:

"This will acknowledge your visit with Mr. Powell concerning the type of guarantee on the Experimental Cotton Picker built for you and designed especially for your community.

"It is mutually understood that in event this machine is a failure and will not pick the cotton that your $1000.00 will be refunded. On the other hand, if the machine is successful in harvesting the cotton in your community, you have agreed to pay the balance of $1636.00 when the machine is sold, or on the due date agreed on, October 1, 1954."

The completed experimental unit was delivered to Modern Farm at the Pine Bluff plant and transported by it to New Roads, Louisiana, for testing. During the picking season of 1954, this machine was tested by Modern Farm in two cotton fields in the New Roads area and sold

to Major Brothers Plantation, where it now remains. Modern Farm expressed satisfaction with the performance of the picking unit and paid the balance of the purchase price.

In June of 1955, Mr. Gabe Myers, salesman for Ben Pearson, came to New Roads, Louisiana and was accompanied by Mr. J. B. Lancaster, President of Modern Farm, and his son, to call on various farmers in the area. Orders were secured for six additional cotton pickers. It is alleged by Modern Farm, and there was testimony to this effect, that Mr. Myers was questioned by the farmers as to the operation of the machine and that he made certain statements that the machine would not drop cotton and would not damage the new, unopened tender bolls. Later in 1955, Modern Farm transmitted an order to Ben Pearson in Pine Bluff for eight cotton pickers. The order was in writing and specified that the machines were to be Ben Pearson's "Rust Model" Cotton Pickers with "special wide row pickers for 6 foot rows". The order did not contain any express warranty. Following the execution and acceptance of the order for the eight pickers, Modern Farm returned the 1954 experimental picker to Ben Pearson's factory in Pine Bluff so that it could be copied and the eight additional pickers modeled upon it.

Ben Pearson made the special frame for the eight cotton pickers covered by the 1955 order and notified Modern Farm that these units were completed and ready for delivery. J. B. Lancaster, Jr., the son, took some trucks to Pine Bluff to transport the units to New Roads. While in Pine Bluff, Mr. Lancaster gave Ben Pearson a check for $2,000.00 representing a partial payment of $250.00 on each unit, gave notes for the deferred balance, and executed and acknowledged separate chattel mortgages on the eight pickers. The units were then transported to the place of business of Modern Farm in New Roads, where six of them were mounted upon tractors and were delivered to the customers who had previously signed orders for them.

The farmers to whom Modern Farm sold the six cotton pickers were dissatisfied with the performance of the units during the year 1955. The specific complaint of the farmers was that the machines dropped an excessive amount of cotton after it had been picked, which could not be recovered. The 1955 harvest season was unusually wet. Although complaints were made to Modern Farm, it influenced the customers to withhold judgment on the units until they were blessed with more favorable conditions. At the end of the 1955 cotton season, on November 15, 1955, the President of Modern Farm made a special trip to Ben Pearson's factory in Pine Bluff for the purpose of requesting an extension of time for payment of the two notes representing the unpaid balance of the purchase price of the two unsold cotton pickers of which Modern Farm still had possession. On the assertion of the President of Modern Farm that he was unable to sell the cotton pickers because of the extremely wet season, Ben Pearson granted a one year extension of time for payment of the notes. The next year, during the picking season of 1956, the six cotton pickers sold by Modern Farm continued to drop an excessive amount of cotton. Both Ben Pearson and Modern Farm made several experiments on the six cotton pickers during the 1956 season calculated to lessen the amount of cotton dropped, but to no avail.

Following the 1956 cotton season, the farmers remained dissatisfied with the performance of the machines, returned them to Modern Farm, and requested a refund of their money. The President of Modern Farm testified that he accepted the return of the pickers and made adjustments with his customers; not because he was legally bound to so do, but because he felt a moral responsibility towards his customers.[1]

1. Since the return of the pickers by the farmers was more than a year from the date on which they purchased them, any action by the farmers against the defend-

**22**

When the two notes executed by Modern Farm in 1955, representing the unpaid purchase price of the two cotton pickers that remained unsold in the hands of Modern Farm, became due in the fall of 1956, Ben Pearson made demand for payment. Modern Farm refused to pay the balance due and this suit was instituted. Modern Farm then filed a counter-claim seeking to annul the sale of all eight cotton pickers on the theory that the machines failed to satisfactorily perform contrary to representations made during the sales negotiations. The real controversy is centered around the counter-claim, since Ben Pearson's suit is on the two notes admitted to be due and payable.

The theory on which Modern Farm relies is the breach of an express warranty by Ben Pearson. In support of its contention, Modern Farm presented the testimony of several farmers concerning Mr. Gabe Myers' alleged representations that the machine would not drop cotton. Ben Pearson maintains that there was no express warranty, and in the absence of such, Modern Farm's claim is untenable since neither the law of Louisiana nor Arkansas will support an action for breach of implied warranty in this case. Under the facts and circumstances of this case, we agree with the learned trial court in holding Modern Farm liable in the original suit and dismissing, its counter-claim.

■ At the outset, Modern Farm makes an attack on the facts found by the trial court. As has been pronounced many times, the findings of the trial court will not be set aside unless found clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Sanders v. Leech, 5 Cir., 1946, 158 F.2d

486. The findings of fact in this case are well supported by substantial evidence. They are not clearly erroneous. The legal conclusions reached are also supported by the facts as found.

■ The trial court was correct in its holding that the contract in question was an Arkansas contract and hence determined by Arkansas law.[2] The law of the forum, in this case Louisiana, determines when and how foreign law is to apply in a given case. 15 C.J.S. Conflict of Laws § 9a. Louisiana Statutes Annotated Civil Code, Article 10 states:

"The form and effect of public and private written instruments are governed by the laws and usages of the places where they are passed or executed."

In T. T. Tyree & Co. v. Sands & Co., 1872, 24 La.Ann. 363, it was held that where a contract for movables is made in another state, it will be enforced in Louisiana in accordance with the laws of the state where made.

■ ■ A contract is made where an offer is accepted or where the bargain becomes mutually binding on both parties. The contract for the manufacture and sale of the eight cotton pickers became a completed transaction and mutually binding on both parties when J. B. Lancaster accepted the pickers in Pine Bluff, Arkansas, to be transported by Modern Farm at its sole expense to New Roads, Louisiana. As was stated in State v. Shields, (1903) 110 La. 547, 34 So. 673, and George D. Witt Shoe Co. v. J. A. Seegars & Co., (1908) 122 La. 145, 47 So. 444, when goods to be delivered by the seller to the buyer become segregated from other goods or appropriated to the contract so that the objects to be sold are readily identifiable,

ant would have been barred by the statute of limitations. LSA–Civil Code, Art. 2534.

2. It should be kept in mind that there were three contracts involved in the sequence of events in this case. First, the contract between Ben Pearson and Modern Farm for the experimental model. Second, the contract between Ben Pearson and Modern Farm for the eight additional machines. Third, the contracts between Modern Farm and the farmers in the sale of the six cotton pickers. It is the second contract that we are concerned with in this case.

the sale becomes executed, and at that time title to the goods passes to the buyer. See also Succession of Welsh, (1904) 111 La. 801, 35 So. 913, 64 L.R.A. 823, and H. B. Claflin & Co. v. Mayer, (1889) 41 La.Ann. 1048, 7 So. 139.

 The written order for the eight cotton pickers contained no express warranty of fitness for any particular purpose. The claimed statements by Mr. Gabe Myers upon which Modern Farm claims it relied, cannot engraft upon the written contract any express warranties. An essential element of an actionable breach of an express warranty is a reliance by the buyer on such representation. The trial court found that the fitness of this particular picker for picking cotton was left to the sole judgment of Modern Farm. The testimony is uncontradicted that Modern Farm relied on its own judgment in 1954 and subsequently ordered eight more similar machines. From the time the eight additional machines were ordered, Ben Pearson had no discretion as to how to build them. They were to be modeled after the 1954 machine which Modern Farm had already determined to be suitable. Consequently, it cannot be said that Modern Farm relied on anything that an agent of Ben Pearson said to third parties, without an express showing of a retreat from the position of satisfaction openly expressed by Modern Farm prior to such alleged representations. Indeed, the trial court found that no such reliance existed.

 Probably more important is the fact that Arkansas **is** committed to the almost universal rule that oral statements cannot be proved to engraft a warranty upon a written contract of sale. Western Cabinet & Fixture Manufacturing Company v. Davis, 121 Ark. 370, 181 S.W. 273. It is said when the parties commit the contract to writing, the written instrument is presumed to encompass the entire contract, and its terms cannot be varied by parol evidence. This is not a rule of evidence, but is one of substantive law based on the substantive rights of the parties. Am.Jur. § 1100,

p. 963. Consequently, Modern Farm can have no recourse to an express warranty in this case.

 We recognize the rule that there is inherent in every written contract of sale of merchandise certain implied warranties, a breach of which gives rise to a cause of action. It is undisputed, however, that the cotton pickers ordered by Modern Farm in 1955 were patented Rust Models manufactured by Ben Pearson, on which it paid royalties, and that their designation in the order as "special wide row pickers for 6 foot rows" characterized them as specified articles well known to and previously tested by Modern Farm. Arkansas has adopted the Uniform Sales Act, Arkansas Statutes Annotated, § 68–1415 (1947). In a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose according to the statute. Actually, this statute was merely declaratory of the law of Arkansas before its adoption. In Kull v. Noble, 178 Ark. 496, 10 S.W.2d 902, decided before the statute, the court approved the rule that where a known and definite article is ordered from a manufacturer, although stated to be for a *particular purpose*, there is no warranty that it shall answer to the particular purpose intended by the buyer. To the same effect is Davis Calyx Drill Co. v. Mallory, 8 Cir., 137 F. 332, which held that a contract to supply a definite and described article, although the vendor knows that the vendee is purchasing it to accomplish a specific purpose, the essence of the contract is the delivery of the specified article and not the accomplishment of the purpose.

 Arkansas Statutes Annotated, § 68–1416, provides that in cases of sale by sample there is an implied warranty that the bulk shall correspond with the sample in quality. There can be no doubt that this was a sale by sample. The 1954 experimental model was tested by Modern Farm and *sent back* to Ben Pearson's manufacturing plant in Pine Bluff for the purpose of having eight addition-

# 24

al pickers manufactured like it. There is no question but that the additional pickers were to be modeled after the experimental model. There is no allegation, and no proof, that the eight pickers, the subject of this suit, did not conform in quality to the 1954 experimental model. As indicated earlier, Ben Pearson had definite latitude in the manufacture and design of the first picker ordered; and it was agreed that if it was a failure the money paid by Modern Farm would be refunded. No refund was requested or made. When the model was returned to Pine Bluff for the manufacture of the eight additional pickers, it was the duty of Ben Pearson to conform the eight additional pickers to the 1954 model.

For the reasons herein given, the judgment is

Affirmed.