**In the Matter of WALLACE LINCOLN–MERCURY, INC., Bankrupt.**
**No. 20743.**

United States District Court,
W. D. Louisiana,
Monroe Division.
May 14, 1971.

Fred W. Jones, Jr., and Kenneth W. Campbell, Ruston, La., for the bankrupt.

James A. Hobbs, Jones, Blackwell, Chambliss, Hobbs & Henry, West Monroe, La., for the trustee.

A. K. Goff, Jr., Goff & Goff, Ruston, La., for Ruston State Bank and Trust Co.

Ragan D. Madden, Dist. Atty., Ruston, La., for Mrs. Lois B. Heard.

George V. Burbach, Dearborn, Mich., William F. Pipes, Jr., Pipes & Pipes, Monroe, La., Peter A. Feringa, Jr., Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for Ford Motor Credit Co.

## RULING ON REVIEW

DAWKINS, Chief Judge.

In this bankruptcy proceeding before us on review, involving a wholesale motor vehicle financing arrangement, Ford did not have a "better idea." The better idea would have been for Ford Motor Credit Company (FMCC), which appeals from the Referee's ruling against it, to have availed itself of Louisiana's chattel mortgage floor plan scheme [1] in order to obtain a security interest clearly provided for in circumstances such as here presented.

FMCC, unmindful of Louisiana law, in an effort to employ standardized forms and agreements to be used throughout the United States, deliberately chose not to avail itself of Louisiana's chattel mortgage floor plan statute. This is notably significant since the documents here involved are structured in terms of

---

1. See La.R.S. 32:701 et seq. "the term 'floor plan loan' shall mean any loan made to a licensed vehicle dealer and secured by a chattel mortgage on a vehicle which constitutes a part of the dealer's stock-in-trade held for sale in the ordinary course of business." La.R.S. 32:702(5).

the Uniform Commercial Code,[2] notwithstanding the well known fact that this State remains the only one which has not adopted that legislation; and further in light of Louisiana's unique Civil Law background and ancient, but still viable, concepts, which find their origins in French and Roman Law.

In essence, the question presented to us upon review is whether the standardized forms and documents used by FMCC, and the nature of the transactions, effected any Louisiana security device on the vehicles in question.[3]

The matter before the Court is the Bankruptcy Referee's Ruling that FMCC did *not* obtain a secured creditor status with respect to some sixty-five Mercury and Lincoln motor vehicles in the possession of Wallace Lincoln-Mercury Co., Inc. (Wallace), the bankrupt.

Without particularizing its specificities and lengthy contractual provisions, the tripartite financing arrangement here confected may be briefly summarized. Wallace executed an "Automotive Wholesale Plan Application for Wholesale Financing" with FMCC in May, 1967. In this "application" FMCC was directed that all new vehicle deliveries were to be made in accordance with the terms of the FMCC "Automotive Wholesale Plan." Wallace, at the same time, executed a power of attorney authorizing "R. C. White * * * and any other officer or employee of Ford Motor Credit Company * * * its true and lawful attorneys with full power of substitution," to execute, acknowledge and deliver to FMCC promissory notes or other evidences of indebtedness, trust receipts, chattel mortgages, conditional sales contracts, and other title retention or secu-

rity instruments necessary or appropriate in connection with wholesale financing to be furnished by FMCC.

Pursuant to these agreements, standardized forms, processed by computers, were prepared indicating by mechanical imprint that promissory notes and "trust receipts" were "executed" by R. C. White and "delivered" to FMCC with respect to specified vehicles. Subsequently, Ford Motor Company was paid by FMCC for the specified vehicles. The vehicles were ordered, as a general course of business, by Wallace from a sales representative of the Lincoln-Mercury Division of Ford Motor Company, from Memphis, Tennessee, who travelled to Wallace's office in Ruston, Louisiana, at least once a month to secure orders.

FMCC seeks relief here based on alternative claims of (1) ownership of the vehicles, (2) a Louisiana vendor's privilege thereon, and (3) a secured status arising from the "Trust Receipts."

*Ownership*

FMCC claims " * * * the ownership of the respective * * * motor vehicles in each instance being in the possession of the bankrupt under a Trust Receipt." The basis for this claim lies in the language of the Trust Receipt itself: "1. Title in said property shall remain in the entruster [FMCC] as security interest for and until the trustee's [Wallace's] payment in cash of all amounts payable under the foregoing promissory note."

At no time did FMCC assert that the title retention mentioned in this document contemplated merely a "security interest" as permitted by the Uniform Commercial Code.[4] To the contrary, FMCC claims *ownership* of the

---

2. For an illustration of the floor plan loan concept under the U.C.C., see Spiedel, Motor Vehicles as the Subject of Sale or Security, 1968 Journal of Business Law, 373. See also Annot. 11 A.L.R.3d 1231, 1237 (1967); Hiller, Secured Transactions in Bankruptcy Administration, 41 Penn.Bar Assoc. Quarterly, 147 (Jan. 1970).

3. The ultimate question, of course, is whether the security interests, if any,

now sought to be recognized, are effective as against the Trustee in Bankruptcy.

4. U.C.C. 2–401(1) provides that "any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of security interest." U.C.C. 1–201(37) defines security interest as "an interest in personal property which secures payment of an obligation." Article 9 of the U.C.C. aplies to all security

vehicles. This claim clearly is predicated upon the traditional Common Law conditional sale concept of title retention. This device unequivocally and uniformly has been rejected by Louisiana Courts, and it is a fundamental principle that a conditional sale is not countenanced, or given its intended legal efficacy, in Louisiana:

"* * * Contracts of this character [conditional sales] have uniformly been held by our courts to evidence credit sales, vesting in the grantee the title to the property described therein. *What is known as a conditional sale—title to the property remaining in the seller until the whole price, for which the purchaser is conditionally bound, has been paid—is not countenanced in this state.* Adams Machine Co. v. Newman, 107 La. 702, 32 So. 38 [1902]; Barber Asphalt Pav. Co. v. St. Louis Cypress Co., 121 La. 152, 46 So. 193 [1908]; Overland Texarkana Co. v. Bickley, 152 La. 622, 94 So. 138 [1922]; Byrd v. Cooper, 166 La. 402, 117 So. 441 [1928]; Grapico Bottling Works v. Liquid Carbonic Co., 163 La. 1057, 113 So. 454 [1917]; Morelock v. Morgan & Bird Gravel Co., 174 La. 658, 141 So. 368 [1931]; United States Slicing Mach. Co. v. Joseph, 7 La.App. 451; Dickens v. Singer Sewing Mach. Co., 19 La.App. 735, 140 So. 296 [1932]." (Emphasis added.) [5]

It is plainly evident from the nature of this transaction that FMCC contemplated and approved removal of the vehicles to this State after their sale. Judge (now Justice) Tate, presently a member of the Louisiana Supreme Court, succinctly and aptly has summarized the status of Louisiana law with respect to conditional sales confected outside Louisiana with knowledge or consent by the creditor that the property would be brought to Louisiana:

"* * * [E]ven though conditional sales * * * are not recognized in Louisiana, through comity the Louisiana courts will nevertheless enforce such transactions when validly confected in another state, even to the prejudice of innocent third persons who have dealt with the property in Louisiana—providing the property has been brought into Louisiana *without* the creditor's consent. If the chattel which was the object of the foreign conditional sale * * * is brought into Louisiana *with* the consent or knowledge of the creditor, however, the Louisiana courts will then apply the Louisiana law and policy protecting third persons who deal with the property in Louisiana *on the theory that the creditor consented to or intended the application of Louisiana law dealings with the movable brought to Louisiana with his consent or to his knowledge.* See, e. g.: Fisher v. Bullington, 223 La. 368, 65 So.2d 880 and Finance Security Co. v. Mexic, La.App.Orleans, 188 So. 657 (conditional sales—also Restatement of Conflict of Laws, Sections 275 and 276); G. F. C. Corp. v. Rollins, 221 La. 166, 59 So.2d 108 and General Motors Acceptance Corp. v. Nuss, 195 La. 209, 196 So. 323 (chattel mortgages—also Restatement, Sections 268, 269, 271)." (Latter emphasis added.)[6]

Here we need not rely solely upon the "theory that the creditor consented to or

---

interests created in personal property including conditional sales and trust receipts.

The U.C.C. has rejected the title concept of conditional sale and in its place created a system of perfecting security interests by filing them in appropriate public records. FMCC introduced no evidence of their intention to perfect such an interest by filing, either in Louisiana (which is not provided for) or outside this State. Further, arguments of counsel in

brief make it clear that the conditional sale contemplated by FMCC here was the *traditional Common Law conditional sale* with its central element of title retention rather than filing or recordation as a security interest.

5. Claude Neon Federal Co. v. Angell, 153 So. 581, 582 (La.App. 2d Cir., 1934).

6. Universal C.I.T. Credit Corp. v. Hulett, 151 So.2d 705, 707, 708 (La.App. 3d Cir., 1963).

intended application of Louisiana law." The "trust receipts" themselves provide: "This agreement shall be interpreted in accordance with the laws of the state of the trustee's [Wallace's] place of business * * *" Louisiana Courts always have held that "[W]here * * * the removal [of property] to Louisiana is with the knowledge and consent of the vendor * * * the conditional sale is not recognized."[7]

██ Wallace here was unconditionally bound for the price of the vehicles and it is self-evident from the nature of the transaction that FMCC intended that the vehicles would be brought to Louisiana for sale by Wallace. Under the extensive Louisiana jurisprudence on this issue, it is perfectly plain that title passed to Wallace and that FMCC's claim of ownership (assuming without deciding it was the vendor) is totally devoid of merit.

*Vendor's Privilege*

FMCC alternatively claims a vendor's privilege on the vehicles. That privilege is provided for in Article 3227 of the Louisiana Civil Code:

> "He who has sold to another any movable property which is not paid for, has a preference on the price of his property over the other creditors or the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.

> "So that although the vendor may have taken a note, bond or other acknowledgment from the buyer, he still enjoys the privilege. * * *"

See In Re Trahan, 283 F.Supp. 620 (W.D.La.1968) for a comprehensive discussion of the nature of Louisiana's

vendor's privilege and its relationship to the Bankruptcy Act.

FMCC urges two bases for its claim to a vendor's privilege: (1) that FMCC had, through the tripartite arrangement, acquired title from Ford Motor Company and then transferred that title to Wallace or (2) that under the authority of Cottonport Bank v. Dunn,[8] the vendor's lien is transferred automatically and directly from the purchaser to the financer with the consent of the seller in conjunction with the execution of the promissory note as provided in the pre-existing tripartite contractual arrangement.

We find it unnecessary to examine the *Cottonport Bank* argument, or to determine as a matter of fact whether Ford Motor Company did effect a transfer of title to the vehicles to FMCC rather than Wallace.[9]

We here assume, *arguendo*, that FMCC did obtain title to the vehicles in transfers from Ford Motor Company, thus precluding the necessity of considering the *Cottonport Bank* argument and affording FMCC its most advantageous hypothesis—that it did in fact have title to the vehicles and was in fact a vendor.

The threshold question in this analysis is to determine where and when title to the vehicles passed from FMCC to Wallace. We previously have shown that the conditional sale attempt to suspend passage of title was ineffective and that, under circumstances such as are here present, title actually passed to Wallace. Still, a critical question to be resolved is whether title was transferred inside or outside Louisiana, *i. e.*, were these Louisiana sales or non-Louisiana sales.

---

7. Fisher v. Bullington, 56 So.2d 321, 324 (La.App. 2d Cir., 1952). See also Pecora v. James, 150 So.2d 90, 92 (La.App. 4th Cir., 1963); Lohman v. Lonergan, 33 So. 2d 705 (La.App. 2nd Cir., 1948).

8. 21 So.2d 525 (La.App. 1st Cir., 1945).

9. The Referee found that the sale took place between Ford Motor Company and Wallace; thus there was no vendor's

privilege in favor of FMCC. We think the evidence, particularly the many documents in the record showing the nature of the sales to be from Ford Motor Company to Wallace, supports the Referee's finding. In the event a higher court should find it necessary for this Court to make such a finding, we would concur with that of the Referee.

While Louisiana Courts never have had occasion to address themselves to the composite question of the effect of a conditional sale made outside Louisiana with knowledge that the goods would be brought into the State, in conjunction with the time of passage of title, there is ample jurisprudence on the two questions presented separately. We believe the matters logically may be resolved on this basis and are in no way nonreconcilable. The former question has been answered above in our disposition of FMCC's claim of ownership. As to the time and place of passage of title, the jurisprudence may be summarized:

"In receiving an order for a certain quantity of goods, of a kind and at a price agreed on, to be manufactured or supplied from a general stock, warehoused at another place, the agent receiving the order merely enters into an executory contract for the sale of goods, which does not divest or transfer the title to any determinate object, and which becomes effective, for that purpose only when specific goods are thereafter manufactured or selected and segregated from the general stock, and appropriated to the contract; and, in the absence of more specific agreement, such appropriation takes place only when the goods as ordered are delivered to the public carrier at the place from which they are to be shipped consigned to the person by whom the order was given, at which time and place the sale is perfected and the title passes. Reaffirming the doctrine applied in State v. Shields et al., 110 La. 547, 34 South 673." [10]

The Court in *Witt* further held no vendor's privilege existed because the con-

tract was a non-Louisiana contract inasmuch as title passed outside the State.

The orders placed by Wallace in Louisiana were mere offers to purchase. Those orders were subject to acceptance and approval outside Louisiana by FMCC (and also by Ford Motor Company). Moreover, the vehicles ordered by Wallace were not at the time of their ordering of such a specific nature as to effect passage of title in Louisiana.

Here, although there was a "more specific agreement" that title would not pass until the goods were paid for, that agreement, as we have shown, simply is not countenanced by Louisiana law. Undoubtedly, the reference to a more specific agreement in *Witt* contemplated a more specific *valid* agreement. We do not think, therefore, that the conditional sale agreements can be said validly to affect the time of passage of title.

■ Louisiana jurisprudence does not provide that conditional sales consummated outside Louisiana with knowledge or consent that the property will be brought to Louisiana converts the action into a Louisiana sale. The cases simply have ruled that such conditional sales will not be given effect and that title does in fact pass to the vendee. The courts, in effect, read out the suspensive condition of payment of the price before title passes.

■ Under the well-settled rule of *stricti juris* in questions of privileges and preferences, this Court, being strictly *Erie*-bound by the law of this State, cannot fashion a rule of law which would convert what otherwise would be an out-of-state sale into a Louisiana sale merely because it was consummated in connection with a conditional sale which is "repugnant to the laws of [Louisiana]." [11]

10. George D. Witt Shoe Co. v. J. A. Seegars & Co., 122 La. 145, 47 So. 444 (1908). See also Consolidated Companies v. Laws, 11 La.App. 676, 124 So. 775 (La.App. 1st Cir., 1929); Succession of Welsh, 111 La. 801, 35 So. 913 (1904); Modern Farm Service, Inc. v. Ben Pearsen, Inc., 308 F.2d 18 (5th Cir. 1962).

*Cf.* Givens v. Southern Farm Bureau and Casualty Co., 197 So.2d 380 (La.App. 2d Cir. 1967) writs refused 250 La. 902, 199 So.2d 916 (1967).

11. Cooper v. Farr, 165 So.2d 605, 610 (La.App. 2d Cir., 1964).

We hold, therefore, that title to the vehicles in question passed outside Louisiana.[12]

The remaining question with respect to FMCC's vendor's privilege claim is whether these non-Louisiana sales give rise to a Louisiana vendor's privilege on the vehicles in question.

FMCC argues that since Louisiana laws should be applied a Louisiana vendor's privilege also should result. We do not agree. The fact that, as regards choice-of-law rules or of contractual agreements, Louisiana law is applied does not mean that all substantive rights gained by a sale *perfected in Louisiana* must accrue to a *non-Louisiana sale.* Neither choice-of-law rules nor the contractual agreements convert a non-Louisiana conditional sale into a Louisiana sale. Only a Louisiana sale gives rise to a vendor's privilege. "The vendor's privilege afforded by our Civil Code is unique. As stated by the court in Brent v. Shouse, 16 La.Ann. 158, the vendor's privilege on a movable is unknown to the common law."[13] The Louisiana vendor's privilege arises only when title to the chattels passes in Louisiana or Louisiana sales are perfected.

Moreover, vendor's privileges are matters of attachment by operation of the law to the transaction of sale in this State. They cannot be conventionally created, nor should they be extended by analogy.

"In Louisiana, no person is entitled to a lien unless specially granted the same by the provisions of the statutes of this State and every statute which grants the privilege of a lien is to be strictly construed, that is, the right granted should never be interpreted to be in any wise broader than the statute which grants it."[14]

Louisiana law does not provide that sales perfected in other States (conditional or not) give rise to a vendor's privilege. Accordingly, under factual circumstances assumed to be most favorable to FMCC's contentions, no vendor's privilege accrued in its favor.

*Trust Receipts*

As the final ground for its claim to secured status, FMCC argues that the "trust receipts" perfected Louisiana security interests. While Louisiana does not provide for trust receipts as security devices, FMCC claims they are merely pledges as contemplated by the Civil Code and should be given effect as such. See La.Civil Code arts. 3183 et seq.

Significantly, unlike a privilege which is created by operation of law and *cannot be created by covenant,* a pledge *is so created:*

"The pledge is a *contract* by which one debtor gives something to his creditor as security for his debt." (Emphasis added.) La.Civ.Code art. 3133.

It is necessary, therefore, to ascertain whether the intent of the parties was to create a pledge as contemplated by Louisiana law.

By the orthodox trust receipt in a tripartite situation, such as existed here, the seller (Ford Motor Company) trans-

---

12. See also, In Re Hoover, Bankruptcy Docket No. 21452 (W.D.La., June 3, 1970).

    As a Federal Court, we do not suggest that the State should not reassess its jurisprudence when a conditional sale is perfected outside Louisiana with knowledge that the property would come into Louisiana and afford a vendor's privilege by jurisprudentially determining that title passed inside Louisiana by operation of law in lieu of enforcing the conditional sales contract. Since a vendor's privilege is valid only so long as the vendee remains in possession, we see no adverse consequences with respect to third parties. (La.Civ.Code arts. 3217(7), 3227). We merely hold that, as a Federal Court, we are not empowered to make such an interpretation of Louisiana jurisprudence.

13. Cooper v. Farr, *supra.*

14. Jesse F. Heard & Sons v. Southwest Steel Products, 124 So.2d 211 (La.App. 2d Cir., 1960).

    La.Civ.Code art. 3185: "Privileges can be claimed only for those debts to which it is *expressly* granted in this Code." (Emphasis added.)

fers title to the lender (FMCC) by taking and delivering a bill of lading in its name. Title to the property is not in the buyer (Wallace).[15]

This is essentially the relationship which FMCC here urges was the intent of the parties in the tripartite arrangement, but which failed because Louisiana will not countenance title retention by means of the traditional Common Law conditional sale.

By the very language of the "trust receipt" ("Title to said property shall remain in the entruster [FMCC] as security"), plus the arguments of FMCC's counsel "([claiming] * * * the ownership * * * [of] said motor vehicles in each instance being in the possession of the bankrupt under a Trust receipt * * * ")", it is clear that FMCC did not intend, upon entering this contractual arrangement, that Wallace would gain title to the vehicles but that title would remain in FMCC.

We reiterate, there was no evidence that FMCC attempted to perfect merely a "security interest" as contemplated by the U.C.C. by filing of record a financing statement as to the conditional sales or trust receipt documents to evidence such intent.[16] We simply are precluded by the plain language of these *contracts* themselves from holding that FMCC intended to perfect, or that Wallace intended to grant, a Louisiana pledge.

█ Louisiana's concept of "pledge," as plainly shown by its Civil Code defi-

nition in article 3133, quoted above, does not contemplate title remaining in or passing to the pledgee, but that muniment of title must be in the pledgor or a third person.[17]

█ Under the plain evidence and facts here present, we find the documents entitled "trust receipts" in this case to be of no other nature than title retention conditional sales. We cannot conclude, except through a deliberate distortion of the parties' intent, as expressed by their plain language, that Wallace and FMCC or either of them contemplated that they were contracting to create a pledge.

While FMCC has pointed to several Louisiana cases [18] recognizing so-called "trust receipts" as valid pledges, in each of those decisions there was no question that the parties did in fact intend to create a pledge relationship. The primary issue presented in those cases was whether a pledge could be effective where possession was not in the pledgee, or, more in point here, where possession was delivered to the pledgor. Even that area of Louisiana law is far from settled.[19]

None of the cases cited recognize that where *title* to the property is *intended* to be in the pledgee it is the intent of the parties to create a pledge. Mere denomination of a document as "Trust Receipt," of course, does not create a unique relationship.[20]

15. See 4A Collier on Bankruptcy § 7058 (p. 668).

16. U.C.C. 9–302.

17. See also, La.Civ.Code arts. 3142, 3143, 3144, 3145, 3152, 3166.

18. Scott v. Corkern, 231 La. 368, 91 So. 2d 569 (1956); Arbuthnot, Latham & Co. v. Richeimer & Co., 139 La. 797, 72 So. 251 (1916); Jacquet v. His Creditors, 38 La.Ann. 863 (1886). *But see,* Powers v. Motors Securities Co., 168 So. 2d 922 (La.App. 2d Cir. 1964); Krepplin v. Demarest, 120 So.2d 301 (La.App.Orl. Cir., 1960).

In each of the first cited cases, in none was there evidence of an intent for the pledgee to have title.

19. See, *e. g.,* Sachse, Using Inventory as Security: A Civil-Law Perspective, 39 Tul.L.Rev. 387 (1965); Note 26 La.L. Rev. 182 (1965); Dainow, "Comments on Scott v. Corkern," 18 La.L.Rev. 49 (1957).

20. Collier aptly notes (Vol. 4A at § 7058 (p. 671)), "We must remember that whether a so-called trust receipt transaction in a given case will be considered as in effect a chattel mortgage, bailment, pledge, conditional sale or some other form of transaction must be resolved by state law [citations omitted]."

 

Professor Slovenko, upon whom counsel for FMCC heavily relies, notes: "[p]ledge depends upon possession in the party secured, and *title to the property is in the pledgor or someone other than the pledgee.*" [21] Even assuming Louisiana would allow *possession* to be in the pledgor in cases such as this, we cannot find there is an intent to create a pledge where it also is the clear intent that *title* is retained by the so-called pledgee.[22]

In general, in this entire series of transactions, FMCC simply failed to take adequate cognizance (if at all) of the nature of the true quality of Louisiana law on security transactions. It now seeks through plainly specious—indeed totally implausible—hind-sight to attempt to convert and pervert these standardized Common Law forms and documents into Louisiana's unique system of law with respect to security devices. As noted at the outset, Louisiana plainly provides a clear, unequivocal and simple means by which FMCC could have achieved a secured status, but it failed to do so and consequently must bear the consequences of its own failure.

Thus there are no unusual or compelling equities in FMCC's favor. It simply has failed to comply with Louisiana's plain legal requisites for perfecting a secured status. It has done less even than required under the Uniform Commercial Code. As noted, the general rule under the U.C.C. is that a security interest, including conditional sales and trust receipts, in order to be valid against the trustee of a bankrupt estate must be perfected by filing a financing statement.[23] FMCC thus would have Louisiana require less than would be necessary under the U.C.C.

The Ruling of the Referee is affirmed.

21. Slovenko, Treatise on Creditor Rights under Louisiana Law, p. 128 (1968). Professor Slovenko's analysis must be read with great care. Much of his analysis, due to the paucity of Louisiana jurisprudence, relies on Common Law concepts alien to Louisiana. He makes no attempt exhaustively to analyze the trust receipt in Louisiana as a security device.

22. We, therefore, need not reach the question whether a pledgee in circumstances such as FMCC posits would prevail against the Trustee in Bankruptcy for the debtor. We express no judgment in that respect and none should be inferred.

We also need not consider the mandate (agency) issue raised by FMCC's opponents in that R. C. White, the named mandatory, did not in fact act. We again express no judgment upon that hypothet, and none should be inferred.

