**Julius B. SELLERS, Jr.**

v.

**TEXAS FLAME & FORGE, INC., etc.**

**Civ. A. No. 81–3071.**

United States District Court,
E.D. Louisiana.

Oct. 7, 1983.

Stephen B. Murray, New Orleans, La., for plaintiff.

Clarence O. Dupuy, Jr., New Orleans, La., for defendants.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

*Findings of Fact*

Plaintiff Sellers sues on a promissory note issued to him by Texas Flame & Forge, Inc. (hereinafter T.F.F.). The corporation defends, contending that the underlying loan was contemplated as, and, accordingly, treated as, a contribution to capital.

In 1977, Sellers and William Monteleone, both Louisiana residents, bought certain shares of stock in T.F.F. previously owned by Edward Cronin and Walter Lewcun. Thereupon, on June 29, 1977, Cronin and Lewcun resigned as directors and Sellers and Monteleone replaced them on the board. Robert Schweis, already on the board, was elected president of the corporation. Monteleone was elected treasurer and Sellers, secretary. As of this time, Schweis owned forty-six percent of the stock, Sellers and Monteleone each owned seventeen percent. (Neither the corporation records nor testimony at trial established the ownership to an *exact* percentage.)

Thereafter, in an effort to enable the corporation to borrow funds, Sellers and Monteleone endorsed notes payable to the Bank of New Orleans. Those notes have been paid prior to this trial.

During the summer of 1978, T.F.F. was operational but was not generating a profit, although it employed approximately 25 people in the manufacturing of valves.

Sellers was traveling on a weekly basis from his home in New Orleans to the company's plant near Houston, in order to help oversee production and to look for business in the area. These efforts, however, did not diminish the operating losses, and, by July, 1978, banks were no longer willing to advance funds to the corporation.

Sellers, Monteleone and Schweis discussed making personal advances to T.F.F. Sellers and Monteleone each advanced one hundred thousand dollars. Schweis declined, proposing, instead, to "sell" some of his stock to Sellers and Monteleone, simultaneously with the advance.

Arthur Ballin, attorney for the corporation, drafted a stock purchase agreement which acknowledged that "the parties hereto are aware of the fact that the corporation is unable to secure funds from outside sources." The agreement provided that Sellers and Monteleone would each pay T.F.F. $100,000 in exchange for promissory notes in the same amount, bearing 8% interest. The agreement further provided that Sellers and Monteleone would each pay $11,500 to Schweis, in ten yearly installments of $1,150, for 115,000 shares—each—of Schweis' stock:

> ... all parties hereto are aware that said loan of $200,000.00 by Purchasers to the corporation is an unsecured loan and the Purchasers (Monteleone and Sellers) have agreed to make that loan to maintain the corporation in business .... the making of said loan is expected to benefit all parties and thus constitutes additional consideration for the sale of said 230,000 shares of stock by Seller (Schweis) to Purchasers. (Parentheticals supplied.)

Schweis, Monteleone and Sellers signed the agreement, as did Ballin as witness. It is dated July 6, 1978.

On July 6, 1978, Sellers and Schweis signed the minutes of a special board meeting held that day. Monteleone signed the waiver of notice for the meeting, but not the minutes.

The minutes of that meeting acknowledge the deficit financial condition of the company, and contain a resolution that Sellers and Monteleone each advance $100,000 to T.F.F. in exchange for promissory notes "in the sum of $100,000 with interest at the rate of 8% percent (sic) per annum." Thus,

Sellers left the meeting with a promissory note, postdated August 1, 1978, which provided:

> On or before one year after date, for value received, we promise to pay to the order of Julius B. Sellers, Jr., one hundred thousand Dollars ... with interest at the rate of 8% percent (sic) per annum.... "

The note was signed by Schweis as president.

After the meeting, Sellers also had possession of a similar note issued to Monteleone. This note was to be turned over to Monteleone.

Lester Weison, a Houston accountant, began performing services for the corporation in 1977. He was responsible for the preparation of its financial statements, made some of the entries into the general ledger and oversaw other entries which were made by corporation employees. Weison left his accounting firm in the summer of 1978, and consequently terminated his services for T.F.F. However, Sellers requested that Weison come to work for T.F.F., which he did in November, 1978.

While performing a "catch-up" review of the records, Weison learned of the advances above noted. (He testified that later, in December, he learned that Sellers had paid part of the advance in August, and the remainder in September, 1978.) Weison found that the Monteleone advance had been listed as "stockholder-payable," the Sellers advance as "account-payable." Sellers instructed Weison to debit accounts payable in the amount of the note and credit stockholder-payable.[1]

Sellers' motive in ordering the accounting change is not clear. Several witnesses contended that Sellers learned that the Internal Revenue Service would treat the advance as a contribution to capital, rather than as a bona fide loan. At least one of the tax evaluations made by T.F.F.'s attorney and accountant was communicated to

---

1. Sellers insisted that he had no recollection of having given such an instruction. Weison stated that he would not have made the entry except upon Sellers' order. Because Weison

was essentially disinterested, and because his recollection was more specific, his testimony is the more credible.

Sellers prior to the relisting of the advance. Further evidence as to Sellers' motivation is too meager to indicate whether he no longer deemed the note collectible, or had only the tax returns in mind, or had confused the issues.

In preparing T.F.F.'s tax returns for the year ending in 1979, Weison did not list the advance as an outstanding loan, although he did so list all other notes then outstanding (to shareholders and outsiders).

On November 4, 1978, Sellers and Monteleone attended a meeting to discuss the possibility of a loan from the Monteleone Hotel—a Louisiana corporation—to T.F.F. Also present was James Thokey, who had performed accounting work for Monteleone since the mid-1950's, and for the Hotel Monteleone in more recent years. Thokey reviewed the books of T.F.F., which listed the Sellers advance of funds as a "stockholder-payable." Sellers at no time indicated to Thokey that the advance should be treated other than as the books indicated.

Thereafter, Monteleone Hotel (hereafter, "Hotel") advanced $400,000 to T.F.F. and received a promissory note. Soon thereafter, Hotel cancelled the note and advanced an additional $100,000, all in return for 90% of the stock in T.F.F. Throughout these negotiations, Hotel was, I conclude, unknowing that a debt—not shown in the records—might be due.

Roberds-Johnson Industries, Inc. is the successor entity following the merger of Roberds-Johnson, Inc. and T.F.F. in October, 1980. Prior to the merger, T.F.F. had been a supplier of Roberds-Johnson. Cecil Johnson, president of that company, testified that prior to the merger, he had been partially familiar with T.F.F.'s business practices, but not with its internal record-keeping. Despite his involvement in the merger negotiations, Johnson never had any

knowledge of the Sellers note until its presentation by Sellers. Minutes of the special meeting were never made a part of the records turned over to Roberds-Johnson. Johnson had carefully reviewed the monthly receivables and payables. He had seen all other notes issued by T.F.F. and outstanding at the time of the merger. The note did not appear on the general ledger for the period 1976–1980. It was not entered on the corporation's list of cash receipts and disbursements. The waiver of notice of the special meeting was absent from the records.

Although Sellers resigned his position as secretary and director in October, 1980, he had held both positions during the various negotiations noted above. Thus, he had been present at meetings when the Hotel loan was discussed, and had been involved in two substantial stock sales (or transfers) without seeing fit to make any sort of disclosure regarding his possession of the note, of which he, alone, was apparently aware. In addition, he had tacitly approved of its listing in the financial records of T.F.F. as a capital contribution.

### Conclusions of Law

The promissory note issued to Sellers was formally sufficient. Schweis, president at the time, had authority to issue the note. Monteleone's ignorance of the issuance, and absence from the meeting, is irrelevant where he waived notice, and a quorum was present. Although Sellers was an interested party, the transaction was not improper: consideration was paid, and the note amount was equal to the advance and reasonable interest. Sellers, at the outset, may well have possessed an enforceable note. Collection turns on various facts subsequent to issuance of the note.[2]

---

2. Defendant has cited tax cases to support treating the advance as a capital contribution. It is true that the Internal Revenue Service treats shareholder advances as capital contributions, rather than loans, under certain conditions. Relevant circumstances include, but are not limited to, the ratio of debt to equity, the proportion of debt and stock investment among

the various shareholders, and the willingness of an unaffiliated party to lend to the corporation. *See, e.g., John Kelley Co. v. Commissioner*, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946); *Plantation Patterns, Inc. v. C.I.R.*, 462 F.2d 712 (5th Cir.1972); *Tyler v. Tomlinson*, 414 F.2d 844 (5th Cir.1969); *Montclair, Inc. v. C.I.R.*, 318

Because jurisdiction over this case is based on diversity of citizenship, this court must apply Louisiana conflicts law. *Modern Farm Service, Inc. v. Ben Pearson, Inc.,* 308 F.2d 18, 22 (5th Cir., 1962). Article 10 of the Louisiana Civil Code provides that "... the effects of acts passed in one country to have effect in another country, is regulated by the laws of the country where such acts are to have effect." *Cf. Brabston v. Gibson,* 50 U.S. 263, 9 How. 263, 13 L.Ed. 131 (1850). (A note executed in Louisiana, payable in Mississippi to a Mississippi resident, is a contract which Mississippi law governs.) Although the instant note stipulates to execution in Houston, it is payable in New Orleans. Louisiana law applies.

A Louisiana appellate case indicates that a marking of payment by a creditor on the books of the debtor serves to remit the debt. In *Succession of Martin,* 335 So.2d 494 (La.App.2d Cir.1976), a mortgagee Smith had marked a debt "paid in full" on both her own books, and on those of the mortgagor Martin. She nevertheless sued Martin's estate on the debt. The appeals court held that she had extinguished the debt by voluntary remission, but at first ruled in her favor, stating that the executrix of the estate had revived the debt by acknowledging it. 335 So.2d, at 496. The dissenting opinion argued that the estate representative had no authority to revive a decedent's debt. *Id.,* at 499. On rehearing, the court entered judgment in accordance with the dissent, on the question of the Smith debt. *Id.*

All of Sellers' actions, including his tacit approvals and acknowledgements, fairly induced the same assumption on the part of the debtor and its potential creditors (or investors) as the manual alterations in *Martin.* Furthermore, *Martin* indicates that the act of designating a debt as extin-

guished precludes an inquiry into the creditor's intent in so doing. 335 So.2d, at 499.

The same acts and omissions which served to remit the debt under Louisiana commercial law estop collection, on equitable grounds.

Under Louisiana law, the estoppel defense has three elements: "(1) a representation by action or word of the plaintiff, (2) the defendant's reliance on that representation and (3) a detrimental change in position by the defendant because of that reliance." *Junker v. Crory,* 650 F.2d 1349, 1357 (5th Cir.1981). The defendant's reliance on Sellers' representational acts (and omissions) was justifiable, where the official corporate records indicated a discharge —indeed, to one unfamiliar with the corporation's history, the books indicated that Sellers' debt never existed. The corporation detrimentally changed its position in the sense that it undertook new obligations and sold its stock on the assumption that the debt was not payable. If the note were now collectible, the later investors might well have a cause of action against T.F.F. Because the configuration of the present defendant is the legal result of the merger between T.F.F. and Roberds-Johnson, it is not only the detrimental reliance of T.F.F. which must be considered. The former Roberds-Johnson, now an indissoluble constituent part of the defending corporation, justifiably believed T.F.F. to be free of the debt, and clearly based its merger terms on that belief.

Sellers served as secretary and a director of T.F.F. while that entity participated in a series of negotiations which, over a substantial period of time, resulted in the transformation of that entity from a corporation owned primarily by Monteleone, Schweis and himself to one which became, at first, heavily indebted to Hotel; then primarily

---

F.2d 38 (5th Cir.1963); *Scriptomatic, Inc. v. U.S.,* 397 F.Supp. 753 (C.D.Pa.1975).

The circumstances surrounding Sellers' advance suggest that the IRS would likely treat it as a contribution to capital, refusing the corporation deductions for interest payments, and refusing Sellers any exclusion of payments as a return of principal.

Tax treatment of the loan, however, does not control the obligations of creditor and debtor as between each other. Although it may well be that the tax discussion at the October 30, 1978 meeting inspired Sellers' instructions to Weison, Sellers' understanding of the tax code is not enough to alter the effect of the note as issued, nor in itself to effect a discharge.

owned by Hotel; and, finally, merged with Roberds-Johnson. Throughout these complicated and protracted negotiations, Sellers was silent as to his now advanced contentions. Yet, the negotiations and procedures noted above clearly took place with all interested parties being of a singleness of understanding regarding any outstanding indebtedness due Sellers: nothing was due. Meanwhile, the process by which new funds were infused—thereby saving Sellers and the other original investors from exposure to far greater personal losses—depended upon the validity of the financial statements of T.F.F.

Sellers, having knowingly and willingly derived the benefits from the transactions hereinabove described and having been privy to those negotiations and the bookkeeping and accounting entries previously discussed, cannot now be heard to say that the validity of his note has somehow survived all of these transactions. He is estopped.

The other contentions raised are mooted by this conclusion.

Defendant's counsel is instructed to prepare a judgment consistent with these findings with each party to bear their own costs.